730 P.2d 952

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Sam H. BENNION, Defendant-Appellant.**

**No. 15717.**

Supreme Court of Idaho.

Dec. 18, 1986.

---

Ronald L. Swafford and Jeffery K. Ward, of the firm Swafford & Ward, Chartered, Idaho Falls, for appellant. Jeffery K. Ward argued.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., and A. René Fitzpatrick, Deputy Atty. Gen., Boise, for respondent. A. René Fitzpatrick argued.

HUNTLEY, Justice.

In this case, appellant, Sam H. Bennion, challenges the constitutionality of the provision of the Idaho Traffic Infractions Act (ITIA) which defines infractions as civil offenses rather than as criminal actions, and denies those accused of infractions a right to a jury trial. We hold that the ITIA violates neither the Federal nor the Idaho Constitution.

## I. BACKGROUND

The facts of this case are undisputed and simple. On March 4, 1984, an Idaho Falls police officer stopped Bennion in his automobile for allegedly passing through an intersection against a red light. To this Bennion pled not guilty. After a trial date was set in the magistrate court of Bonneville County, Bennion made motion for a

jury trial. This motion was denied. At the subsequent trial, Magistrate Mildred R. McClure found Bennion guilty of the infraction, and fined him $35.00. Bennion appealed the denial of his motion to the district court in Bonneville County (Judge H. Reynold George). Judge George upheld the decision of the magistrate court. This appeal followed.

Bennion was accused of disobeying the instruction of an official traffic control device in violation of I.C. § 49–611(1). The Idaho Traffic Infractions Act defines this as an "infraction," I.C. § 49–3406(1), which is "a civil public offense.... for which there is no right to a trial by jury...." I.C. § 49–3401(3). Bennion challenges both the validity of the Idaho Traffic Infractions Act and the constitutionality of the denial of his right to a jury trial under the Idaho Constitution.[1]

There is no dispute that the United States Constitution does not require a jury trial in the instant circumstances. The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." The requirements of the Sixth Amendment pertain to proceedings under state law and in state courts by virtue of the Due Process Clause of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968). However, the United States Supreme Court has further held that "there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision and should not be subject to the Fourteenth Amendment jury trial requirement here applied to the States." *Id.* at 159, 88 S.Ct. at 1452, *see also, e.g., District of Columbia v. Clawans*, 300 U.S. 617, 625–27, 57 S.Ct. 660, 662–63, 81 L.Ed. 843 (1937) (prosecution for violation of statute prohibiting the selling of unused portions of railway excursion tickets requires no jury trial); *Schick v. United States*, 195 U.S. 65, 66–68, 24 S.Ct. 826, 826–27, 49 L.Ed. 99 (1904) (prosecution for violation of statute prohibiting the receipt for sale of unstamped oleomargarine, punishable by a $50 fine and no imprisonment, required no jury trial).

■ The United States Supreme Court has declined to delineate "the exact location of the line between petty offenses and serious crimes," *Duncan, supra,* 391 U.S. at 161, 88 S.Ct. at 1453, but has afforded considerable guidance. As a measure of what the Sixth Amendment requires, the United Supreme Court observed:

Crimes carrying possible penalties up to six months do not require a jury trial if they otherwise qualify as petty offenses. But the penalty authorized for a particular crime is of major relevance in determining whether it is serious or not and may in itself, if severe enough, subject the trial to the mandates of the Sixth Amendment. The penalty authorized by the law of the locality may be taken "as

1. The Idaho Constitution provides in pertinent part:

Art. 1, § 7. **Right to trial by jury.**—*The right of trial by jury shall remain inviolate;* but in civil actions, three-fourths of the jury may render a verdict, and the legislature may provide that in all cases of misdemeanors five-sixths of the jury may render a verdict. A trial by jury may be waived in all criminal cases, by the consent of all parties, expressed in open court, and in civil actions by the consent of the parties, signified in such manner as may be prescribed by law. In civil actions the jury may consist of twelve or of any number less than twelve upon which the parties may agree in open court. Provided, that in the cases of misdemeanor and in civil actions within the jurisdiction of any court inferior to the district court, whether such case or action be tried in such inferior court or in district court, the jury shall consist of not more than six.

Art. 5, § 1. **Forms of action abolished.** —The distinctions between actions at law and suits in equity, and the forms of all such actions and suits, are hereby prohibited; and there shall be in this state but one form of action for the enforcement or protection of private rights or the redress of private wrongs, which shall be denominated a civil action; *and every action prosecuted by the people of the state as a party, against a person charged with a public offense, for the punishment of the same, shall be termed a criminal action.*

Feigned issues are prohibited, and the fact at issue shall be tried by order of the court before a jury. (Emphasis added.)

a gauge of its social and ethical judgment" of the crime in question. *Id.* at 159–60, 88 S.Ct. at 1452–53 (citations omitted).

*See also Baldwin v. New York,* 399 U.S. 66, 68–69, 90 S.Ct. 1886, 1887–88, 26 L.Ed.2d 437 (1970) ("we have held that a possible six-month penalty is short enough to permit classification of the offense as 'petty,' [citations]"). As a measure of what it considered a fine so "petty" that no jury is warranted, the Court noted that in addition to a maximum of six months in prison, federal petty offense are punishable by a maximum fine of $500. *Duncan, supra,* 391 U.S. at 161, 88 S.Ct. at 1453 (citing 18 U.S.C. § 1). Such "objective criteria" primarily determine the scope of the Sixth Amendment. *Baldwin, supra,* 399 U.S. at 68, 90 S.Ct. at 1887. Since the violation of an infraction "is punishable only by a penalty not exceeding one hundred dollars ($100) and no imprisonment," I.C. § 49–3406(1), Bennion concedes, and we agree, that the Sixth and Fourteenth Amendments do not afford him a jury.

Nevertheless, Bennion argues that Article 1, § 7 of the Idaho Constitution guarantees him a jury trial. State constitutions can afford greater procedural protections to accused persons than does the federal constitution. *Gibson v. State,* 110 Idaho 631, 635, 718 P.2d 283, 287 (1986); *State v. Newman,* 108 Idaho 5, 10 n. 6; 696 P.2d 856, 861 n. 6 (1985); *Hellar v. Cenarrusa,* 106 Idaho 586, 590, 682 P.2d 539, 542 (1981); *see also, e.g., Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *City of Pasco v. Mace,* 653 P.2d 618, 623 (Wash.1983) (held that Washington Constitution guaranteed a jury trial for an offense which under the federal constitution would be classified as "petty").

■ As a preliminary matter Bennion argues, the state concedes, and we agree, that although the ITIA defines infractions as "civil public offense[s]," I.C. § 49–3401(3), for purposes of constitutional analysis, they must be considered criminal. Without ambiguity, the Idaho Constitution states, "Every action prosecuted by the people of the state as a party, against a person charged with a public offense, for the punishment of the same, shall be termed a criminal action." Article 5, § 1. This provision by itself, however, does not establish that all criminal actions trigger the right to jury trial contained within Article 1, § 7. On its face, Article 1, § 7 does not expressly preserve the right to jury trial in the case of all criminal actions. Conversely, Article 1, § 7 does not expressly exclude minor criminal actions from its purview.

This Court has not addressed the constitutionality of the provisions of the ITIA which deny jury trials to those accused of infractions; nor has this Court addressed the more general question of whether there exists a category of criminal offenses which are so minor as to fall outside the jury requirement of Article 1, § 7. In *McDougall v. Sheridan,* 23 Idaho 191, 128 P. 954 (1913), the Court carved out a narrow exception to allow courts "to punish summarily for contempt." *Id.* at 222, 128 P. at 965. In *People v. Burnham,* 35 Idaho 522, 207 P. 589 (1922), the state had brought an action against a school teacher "under C.S., sec. 7024, which authorizes the prosecuting attorney to bring such an action 'in the name of the people of the state against any person who usurps, intrudes into, holds or exercises any office or franchise, real or pretended, within this state, without authority by law.'" *Id.* at 524, 207 P. at 590. By statute, the subsequent proceedings did not require a jury. The Court held that Article 1, § 7 had no application, because (1) the same proceeding did not require a jury at the time of statehood, and (2) the proceeding was civil rather than criminal according to its statutory designation and according to its nature. *Id.* at 524–26, 207 P. at 590. Neither of these cases established either the existence or nonexistence of a category of minor criminal offenses for which no jury trial is required.

The closest this Court has come to answering this question was in *State v. Romich,* 67 Idaho 229, 176 P.2d 204 (1946), and

its progeny, *State v. Leonard,* 67 Idaho 242, 176 P.2d 214 (1946); *State v. Brunello,* 67 Idaho 242, 176 P.2d 212 (1946); *State v. White,* 67 Idaho 309, 177 P.2d 472 (1947); and *Miller v. Winstead,* 75 Idaho 262, 270 P.2d 1010 (1954). In these cases, the Court dealt with I.C. § 49–121, a statute originally enacted in 1913 and now repealed. That section permitted "cities of the first class" (those containing more than 15,000 inhabitants) to try and dispose of violations of city ordinances without a jury. In each case, the accused persons had appealed the decision of the municipal court to the state district court, and at that point demanded a jury.

In none of these cases did the Court reach the constitutionality of I.C. § 49–121 or of jury-less municipal proceedings pursuant to § 49–121. The Court only held that once the proceeding reached the district court, statutory law entitled the defendant to a jury trial. *Romich, supra,* 67 Idaho at 241, 176 P.2d at 212; *Miller, supra,* 75 Idaho at 265–66, 270 P.2d at 1012. In *Romich,* Justice Miller noted that there was "no instance where any provision with respect to trial by jury was enacted for cities or villages until subsequent to the approval and ratification of the Idaho Constitution in 1890." *Romich, supra,* 67 Idaho at 238–39, 176 P.2d at 210 (Opinion of Miller, J.). Consequently, Justice Miller expressed the view that "because of the provision that the right of trial by jury shall remain inviolate [Article 1, § 7], it would seem to us that the legislature could pass no valid act which denied to a defendant in a criminal prosecution under an ordinance or statute the right to a trial by jury." *Id.* at 239, 176 P.2d at 210. Notwithstanding Justice Miller's use of the pronoun "us," no other justice shared his view. In *Winstead,* Justice Taylor expressed the view that there never had been the right to a jury in cases involving violations of local police regulations. *Winstead, supra,* 75 Idaho at 266, 270 P.2d at 1012 (Taylor, J., concurring specially). Again, Justice Taylor's views belonged only to himself.

Nearly a century has passed since Article 1, § 7 was ratified. Nevertheless, through one twist of fate or another, this Court has left unanswered the question of the existence of a category of minor criminal offenses lying outside the bounds of the jury requirement. To that question and to the question of the constitutionality of the ITIA we now turn.

## II. MINOR CRIMINAL OFFENSES, THE IDAHO TRAFFIC INFRACTIONS ACT, AND THE IDAHO CONSTITUTION'S PROVISION FOR THE RIGHT TO TRIAL BY JURY

### A. *The Standard of Construction of Article 1, Section 7.*

The right to trial by jury always has been salient to the American people. In no less a document than the Declaration of Independence, our nation's founders grounded, in part, their dissolution of political ties with Great Britain on the King's "depriving us, in many cases, of the benefits of trial by jury." As the United States Supreme Court has observed, the Framers of both the federal and state constitutions interposed juries of citizens between governments and those persons the governments have accused of wrong in order to avert the abuse of authority:

> The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the com-

pliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence. *Duncan, supra,* 391 U.S. 155–56, 88 S.Ct. at 1450–51.

The Framers of the Idaho Constitution phrased their convictions in unequivocal fashion: "The right of trial by jury shall remain inviolate...." Idaho Const. Article 1, § 7.

"[T]his Court," Justice McQuade accurately observed, "has a duty to protect the people's rights as enumerated in the Idaho and United States Constitutions from legislative encroachment." *Thompson v. Hagan,* 96 Idaho 19, 24, 523 P.2d 1365, 1371 (1974). The right to a jury trial is a fundamental right, and must be guarded jealously. *Farmer v. Loofbourrow,* 75 Idaho 88, 94, 267 P.2d 113, 116 (1954).

This Court long and often has stated that Article 1, § 7 preserves the right to jury trial as it existed at the common law and under the territorial statutes when the Idaho Constitution was adopted. *E.g., Burnham, supra,* 35 Idaho at 526, 207 P. at 590; *Christensen v. Hollingsworth,* 6 Idaho 87, 93, 53 P. 211, 212 (1898). This standard of construction holds sway in the criminal as well as civil context. *Dutton v. District Court,* 95 Idaho 720, 723, 518 P.2d 1182, 1185 (1974) (involved criminal contempt); *State v. Jutila,* 34 Idaho 595, 597, 202 P. 566 (1921) (involved robbery). Most jurisdictions interpret their analogous constitutional provisions in an analogous way. *E.g., People v. Collins,* 17 Cal.3d 687, 131

Cal.Rptr. 782, 552 P.2d 742, 745 (1976); *Rothweiler v. Superior Court,* 100 Ariz. 37, 410 P.2d 479, 485 (1966); *see generally,* 47 Am.Jur.2d *Jury,* §§ 7, 17. The standard embodies the common sense notion that, by employing the phrase "shall remain inviolate," the Framers must have intended to perpetuate the right as it existed in 1890. *Burnham, supra,* 35 Idaho at 525–26, 207 P. at 590; *Christensen, supra,* 6 Idaho at 94, 53 P. at 212; *accord, State v. Cousins,* 97 Ariz. 105, 397 P.2d 217, 218 (1964); *Town of Montclair v. Stanoyevich,* 6 N.J. 479, 79 A.2d 288, 293 (1951).

The standard should not be taken to extreme. The Framers did not intend to *literally* freeze the law precisely as it existed in 1890. To do so would yield the absurd result of affording no right to jury trial to those accused of crimes that happened not to be in statutory or common law existence at that arbitrary point in history. As the California Supreme Court said:

> "It is suggested that the statute was enacted since the adoption of the Constitution, and for that reason is not within the guaranty of trial by jury. The constitutional right of trial by jury is not to be narrowly construed. It is not limited strictly to those cases in which it existed before the adoption of the Constitution but is extended to cases of like nature as may afterwards arise." *People v. One 1941 Chevrolet Coupe,* 37 Cal.2d 283, 231 P.2d 832, 844 (1951).

The Framers of the Idaho Constitution were well aware of the nature of a constitution. For example, during the debate over amendments to Article 1, § 7, Judge John S. Gray stated:

> We came here, I supposed, to draft a constitution; that is, to make general rules and general laws; that is, to give general directions and lay a foundation that is broad enough for legislative enactment, and when the legislative enactments are enacted from that, that they may be changed from time to time. *Pro-*

38

*ceedings and Debates of the Constitutional Convention of Idaho* 226 (1889).[2] We do not believe the Framers meant Article 1, § 7 to serve as a shorthand enactment into perpetuity of existing statutory and common law on the right to jury trial.

In their law review article on the right to jury trial under the federal constitution, Felix Frankfurter and Thomas Corcoran documented the shifting nature of the right at the common law of Great Britain, and observed:

> [W]hile the Constitution was written in 1787, it was not written for 1787. Its language, while rooted in the concrete experience and practices of the framers, may spread beyond into fresh soil. Historic continuity in constitutional construction does not necessarily mean historic stereotype in application. To what extent respect for continuity demands adherence merely to what was, involves the art of adjudication—raises those questions of more or less that ultimately decide cases. This is the judge's function, not ours. But in striking the final balance, the claims of history, in a case presenting the problem under discussion, will weigh heavily. Frankfurter and Corcoran, *Petty Offenses and the Constitutional Guaranty of Trial by Jury,* 39 Harv.L.Rev. 917, 922 (1926) (hereinafter "Frankfurter and Corcoran") (footnote omitted).

Certainly the right to a jury trial as it existed in 1890 is the beginning point of our analysis of the meaning of Article 1, § 7. The "claims of history", of necessity, will "weigh heavily." Frankfurter and Corcoran, *supra,* at 922. Though we are not bound by historic stereotype, we will endeavor to interpret Article 1, § 7 *consistent with* the right to jury trial as the Framers conceived it. *Cf. Clawans, supra,* 300 U.S. at 627, 57 S.Ct. at 663 ("We are aware that those standards of action and of policy which find expression in the common and statute law may vary from generation

to generation. Such change has led to the abandonment of the lash and the stocks, and we may assume, for present purposes, that commonly accepted views of the severity of punishment by imprisonment may become so modified that a penalty once thought to be mild may come to be regarded as so harsh as to call for the jury trial, which the Constitution prescribes, in some cases which were triable without a jury when the Constitution was adopted."); *Baker v. City of Fairbanks,* 471 P.2d 386, 396 (Alaska 1970) ("We feel that the argument from history is not determinative because what was practical historically is not necessarily adequate to the needs of our times. To look only to history would deny a progressive development of our legal institutions.").

We do well to remember and follow the teachings of Mr. Justice Holmes:

> [W]hen we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. It was enough for them to realize or to hope that they had created an organism; it has taken a century and has cost their successors much sweat and blood to prove that they created a nation. The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago. *Missouri v. Holland,* 252 U.S. 416, 433, 40 S.Ct. 382, 383, 64 L.Ed. 641 (1920).

The Idaho Constitution and its Framers deserve as much.

B. *Right to Jury Trial at the Common Law of England, in other Jurisdictions, and in Idaho at the Time of Statehood.*

The common law of England and the law of the colonies preceded, but differed mark-

**2.** This Court previously has observed:

In determining the constitutionality of a statute, the court may properly consider the proceedings of the Constitutional Convention so as to interpret the applicable provisions of the Constitution as nearly as possible in a

manner consonant with the objects and purposes contemplated by the framers of the Constitution at the time of its adoption. *Idaho Telephone Co. v. Baird,* 91 Idaho 425, 429, 423 P.2d 337, 341 (1967).

edly from, the territory of Idaho's law on jury trials. Frankfurter and Corcoran discovered a "great volume of offenses" subject to summary trials before English magistrates. Frankfurter and Corcoran, *supra*, at 928:

> Violations of the laws relating to liquor, trade and manufacture, labor, smuggling, traffic on the highway, the Sabbath, "cheats," gambling, swearing, small thefts, assaults, offenses to property, servants and seamen, vagabondage, and disorderly conduct were largely in the justices' hands. If we add *qui tam* prosecutions which in earlier days preceding the modern system of public prosecution were hardly distinguishable from regular state proceedings, there are at least a hundred more within the jurisdiction of the unaided justices. *Id.* (footnotes omitted).

Frankfurter and Corcoran delineated three salient features of these offenses: (1) The general rule was that those accused of crimes had the right to trial by jury; specific withdrawals were necessary to accomplish summary proceedings. (2) "There was no unifying consideration as to the type of criminal offense subject to summary trial"; the offenses ranged from the truly "petty" to those bordering on serious felonies. "The controlling factor seems less the intrinsic gravity of the offense ... than the desire for a swift and convenient remedy." (3) "Nor was there uniformity about appeals." Some statutes gave no right to appeal; some could be retried without a jury. *Id.* at 927. Punishment ranged from fines, to corporal punishment, to imprisonment at hard labor. *Id.* at 932.

Before and at the time of Independence, summary procedures were well-established in the colonies. *Id.* at 933, 936–37. Believing that the Framers of the United States Constitution assumed the continuation of this situation, the United States Supreme Court has held that the guarantees of Article III, § 2 and the Sixth Amendment do not extend to petty crimes. *Callan v. Wilson,* 127 U.S. 540, 555, 8 S.Ct. 1301, 1306, 32 L.Ed. 223 (1888); *Schick v. United States,* 195 U.S. 65, 70, 24 S.Ct. 826, 827, 49 L.Ed. 99 (1904); *but see* Kaye, *Petty Offenders Have No Peers!,* 26 U.Chi.L.Rev. 245 (1959) (argues that the Framers abhorred and sought to end the practice of summary proceedings). Some supreme courts of states which numbered among the original thirteen have made similar assumptions. *E.g. State v. Anonymous,* 6 Conn.Cir. 451, 275 A.2d 618, 619 (1971); *State v. Maier,* 13 N.J. 235, 99 A.2d 21, 47 (1953).

In other states, the scope of right-to-jury-trial constitutional provisions are as diverse as is the Union itself. Many jurisdictions have determined that the law of their states at the time their constitutions were adopted provided for summary proceedings in some circumstances. *E.g., Vallejos v. Barnhart,* 102 N.M. 438, 697 P.2d 121, 123 (1985); *Bruce v. State,* 126 Ariz. 271, 614 P.2d 813, 814 (1980); *State v. Young,* 194 Neb. 544, 234 N.W.2d 196, 197–98 (1975).

The test for what constitutes a "petty" offense in all these courts has evolved from a purely historical approach to one which evaluates the severity of the penalty and the nature of the offense. *E.g., Clawans, supra,* 300 U.S. at 627, 57 S.Ct. at 663; *Baker, supra,* 471 P.2d at 393; *O'Neill v. Mangum,* 445 P.2d 843, 844 (Ariz.1968). Depending on the jurisdictional background law and on the court's evaluation of the two factors, the results of this test have ranged from holdings that assault and battery is a petty offense, *Goldman v. Kautz,* 111 Ariz. 431, 531 P.2d 1138, 1139 (1975), to holdings that any offense involving incarceration triggers the right of the accused to a jury trial, *Baker, supra,* 471 P.2d at 401.

Still other jurisdictions have found that their constitutions afford the right to a jury trial in *all* criminal proceedings without exceptions for "petty" offenses. *City of Pasco v. Mace,* 98 Wash.2d 87, 653 P.2d 618, 625 (1983) ("It is our conclusion that, under the concept embodied in the constitution of Washington, enacted as it was in light of the laws of the territory existing at that time, no offense can be deemed so petty as to warrant denying a jury if it

constitutes a crime."); *Hendershot v. Hendershot*, 164 W.Va. 190, 263 S.E.2d 90, 95 (1980) ("We recognize that *Bloom*'s empirical survey of the right to a trial by jury in colonial times reaches a different result as to petty offenses. However, we cannot ignore our own historical roots, which are embedded in such clear and unequivocal constitutional, statutory and judicial language."); *Franklin v. State*, 576 S.W.2d 621, 623 (Tex.Ct.App.1978); *People v. Burnett*, 55 Mich.App. 649, 223 N.W.2d 110, 111 (1974); *State v. Sklar*, 317 A.2d 160, 171 (Me.1974); *State v. Becker*, 130 Vt. 153, 287 A.2d 580, 581–82 (1972); *Peterson v. Peterson*, 278 Minn. 275, 153 N.W.2d 825, 828 (1967); *State v. Voss*, 34 Wis.2d 501, 149 N.W.2d 595, 597 (1967).

In the territory of Idaho, at the time of statehood, a similar situation existed as in the territory of Washington. *See City of Pasco, supra,* 653 P.2d at 625. The territorial statutes defined "[a] crime or public offense" as:

an act committed or omitted in violation of a law forbidding or commanding it, and to which is annexed, upon conviction, either of the following punishments: 1. Death; 2. Imprisonment; 3. Fine; 4. Removal from office; or, 5. Disqualification to hold and enjoy any office of honor, trust or profit in this Territory. Rev. Stat. § 6309 (this and subsequent references are to the 1887 territorial statutes).

All crimes were comprehensively divided into two categories: felonies and misdemeanors. Rev.Stat. § 6310. Felonies were punishable by imprisonment in the territorial prison for a maximum of five years, and/or by a maximum fine of $5,000. Rev. Stat. § 6312. *"Every other* crime is a misdemeanor," Rev.Stat. § 6311 (emphasis added), punishable by imprisonment in a county jail for a maximum of six months and/or a maximum fine of $300. Rev.Stat. § 6313. "The proceeding by which a party charged with public offense is accused and brought to trial and punishment, is known as a criminal action." Rev.Stat. § 7352. The statutes incorporated common law criminal offenses not specifically enumerated. Rev.Stat. § 7232. In sum, under these provisions, (1) every public offense was either a misdemeanor or a felony, and (2) the prosecution of every public offense was a criminal action.

Every prosecution of a public offense, whether a misdemeanor or felony, carried with it the right to trial by jury:

No person can be convicted of a public offense unless by verdict of a jury, accepted and recorded by the court, or upon a plea of guilty, or upon a judgment of a Probate or Justice's Court, a jury having been waived, in a criminal case not amounting to a felony. Rev. Stat. § 7358; *see also* § 3974 ("Thereafter, if the action is a criminal one, the jury must be impaneled as provided by the statutes related thereto.").

This law governed proceedings before district courts, justice's courts, probate courts, and magistrates. *Id.* (jury required in all criminal actions unless waived in non-felony cases); Rev.Stat. § 8284 (justice's and probate courts may only try criminal cases without a jury "if the parties waive a trial by jury"); Rev.Stat. §§ 7510, 7511 (definition of magistrates).

The territorial statutes made but few exceptions to the right to a jury trial in criminal actions. Section 5157, found in the civil part of the statutes, provided:

When a contempt is committed in the immediate view and presence of the court, or judge at chambers, *it may be punished summarily;* for which an order must be made, reciting the facts as occurring in such immediate view and presence, adjudging that the person proceeded against is thereby guilty of a contempt, and that he be punished as therein prescribed. (Emphasis added.)

Contempt generally was defined as a misdemeanor crime. Rev.Stat. § 6529. Section 7459, found in the penal part of the statutes, provided for summary procedures to remove miscreant public officials:

When an information in writing verified by the oath of any person, is presented to a District Court, alleging that any officer within the jurisdiction of the court has

been guilty of charging and collecting illegal fees for services rendered or to be rendered in his office, or has refused or neglected to perform the official duties pertaining to his office, the court must cite the party charged to appear before the court at a time not more than ten nor less than five days from the time the information was presented, and on that day or some other subsequent day, not more than twenty days from that on which the information was presented, must proceed to hear, *in a summary manner*, the information and evidence offered in support of the same, and the answer and evidence offered by the party informed against; and if on such hearing it appears that the charge is sustained, the court must enter a decree that the party informed against be deprived of his office, and must enter a judgment for five hundred dollars in favor of the informer and such costs as are allowed in civil cases. (Emphasis added.)

Other than these two isolated exceptions, we find no provision for summary criminal trials.[3]

Neither do we perceive any implicit recognition of summary proceedings for petty crimes as at the pre-revolutionary common law of England. In many instances the statutes specifically provided for jury trials where they were disallowed at the English common law. For example, a gambling offense, considered petty at the common law, Frankfurter and Corcoran, *supra*, at

928, was a misdemeanor to which attached the right to a jury trial. Rev.Stat. §§ 6850, 7358. The same can be said for petit larceny. Rev.Stat. §§ 7049, 7051, 7358. The statutes are absolutely clear that all criminal actions, including criminal offenses defined not by statute, but at the common law, entitled the accused to a jury trial. Rev.Stat. §§ 7358, 7232. The statutes adopted the common law of England only in "cases not provided for in these Revised Statutes." Rev.Stat. § 18. Since the statutes comprehensively provided for the right to a jury trial in criminal actions, any common law exceptions would have no force or application.

As Frankfurter and Corcoran explained, even at the common law of England, "[t]here was a specific withdrawal from trial by jury of specific offenses in specific statutes, rather than a general formula for summary procedure." Frankfurter and Corcoran, *supra*, at 927. At the time of statehood, the territory of Idaho made two specific exceptions to an otherwise all-encompassing grant of the right to jury trial in criminal actions.

C. *The Intent of Article 1, Section 7 Examined.*

The Framers' use of the language, "[t]he right of trial by jury *shall remain* inviolate," Article 1 § 7 (emphasis added), implies that they intended to perpetuate at least in a general way the existing right to

---

3. We found two provisions in the civil portion of the statutes which provided for fines of violators but left some question on whether or not the accused would receive a jury trial. Rev. Stat. § 973 empowered road overseers to post notice "that there is 'Five dollars fine for riding or driving on this bridge faster than a walk.' Whoever thereafter rides or drives faster than a walk on such bridge is liable to five dollars for each offense," and § 975 apparently authorized the overseers to "recover" the fine. Rev.Stat. § 1241 established fines for allowing certain stallions, ridglings, or unaltered mules or jackasses to run at large.

Despite their location in the civil section, these fall within the definition of crimes or public offenses, since the punishment for their violation was by fine. Rev.Stat. § 6309. All public offenses carried with them the right to

demand a jury. Rev.Stat. § 7358. We believe that under the territorial statutes persons accused of violating these statutes could demand a jury trial.

Even if these two isolated statutes did not invoke the jury provision, they hardly establish a "category" of public offenses for which no right to jury trial existed. Rather, they would confirm Frankfurter and Corcoran's observation that specific withdrawals of the right were necessary to defeat the assumption that a right existed. Otherwise, the territorial statutes afforded the right universally.

What the absence of a jury for these two provisions would do is support our holding, *infra*, that Article 1, § 7 guarantees a jury trial whenever imprisonment threatens, but not necessarily in all other cases.

a jury trial. The existing right, as just discussed, was certainly broad.

Article 1, § 7 also included the following language: "[T]he legislature may provide that in all cases of misdemeanors five-sixths of the jury may render a verdict. A trial by jury may be waived in all criminal cases not amounting to felony, by the consent of both parties, expressed in open court...." The implication of the first sentence as quoted is that in "all cases of misdemeanors" there is the right to a jury, five-sixths of which may render a verdict. The implication of the second sentence is that "in all criminal cases" there is a right to a jury, which may be waived in the case of non-felony cases. The inferred intention to afford a jury trial in every criminal case, whether involving a serious or a petty offense, would be consistent with the provisions of the territorial statutes at the time of statehood.

To assume the Framers were unaware of the implications of their language or of the state of the law at the time would be foolhardy.[4] Nearly half of the delegates and sixteen of the twenty-five committee chairs were attorneys. *Proceedings and Debates of the Constitutional Convention of Idaho* 160 (1889). The delegates displayed a thorough knowledge of the common law history of the right to jury trial. *Id.* at 155–56, 161, 220–21, 230, 256–57. Though they had respect for the English common law, "it does not necessarily follow," as delegate Shoup put it, "that because a thing is English that it is not susceptible of reform or amendment." *Id.* at 219; *see also Id.* at 223, 228 (comments indicating that the convention sought to modify common law premises on the right to jury trial). Ultimately, the convention rejected the common law rule requiring unanimous jury verdicts. *Id.* at 259. They no doubt were aware of the practice of summary procedure at the English common law.

The delegates also knew of, but rejected, the practice under federal law of dispensing of juries in the case of misdemeanors. *Id.* at 249 ("But in misdemeanors the punishment is small, and therefore they will dispense with juries under the laws of the United States, altogether in some cases, and do not allow a jury at all, although it is a crime,—so-known."); *see also Id.* at 257. Knowing what they knew, the convention, with unanimity, expressed the intent to afford a jury in trials involving every crime, whether felony or misdemeanor. *Id.* at 148, 159, 214, 219, 236, 240–41, 245, 248. The jury trial system the Framers apparently wished to perpetuate was reflected best in the territorial statutes. That system was far more expansive than that of the common law or federal law.

In short, every indication from the law of 1890 and from the deliberations of the constitutional convention points to there being a right to a jury trial in every extant criminal action, with the probable exception of some contempt proceedings and the removal of public officials.

In spite of all this, we believe the Framers did not rule out the possibility of summary proceedings for some future-defined criminal actions. Just as the Framers must have known that territorial law provided a jury trial in virtually all criminal actions, they also must have known that in the instances of contempt and the removal of public officials, territorial law denied the right to a jury trial. Even so, they apparently desired that this situation "remain" as it was. It follows that summary proceedings were not necessarily entirely abhorrent to the Framers.

Significantly, *the language of Article 1, § 7 and Article 5, § 1 does not preclude the existence of a future defined class of crimes to which the right of jury trial does not apply.* Admittedly, the Framers appeared to conceive of all contemporary criminal actions as carrying with them the right to jury trial. Nevertheless, they

---

**4.** While most of their debate centered on amendments to art. 1, § 7 to allow for less than unanimous verdicts, the delegates gave glimpses of their views on the right to jury trial in general.

chose not to expressly require that all criminal actions be tried before a jury. Such language appears in the federal constitution and in many state constitutions. *See e.g.* Indiana Const. Article 1, § 13; Maine Const. Article 1, § 6. Instead, they chose more general phraseology. As earlier noted, the Framers knew it was a constitution they were drafting.

Still more significantly, with only the few possible exceptions previously noted, *supra*, n. 3, even the most minor of territorial misdemeanors entailed possible imprisonment. Rev.Stat. § 6313. When viewed from the perspective of the potential punishment involved, the right to jury trial at the time of statehood extended primarily to offenses potentially punishable by imprisonment, excepting contempt.

■ The possibility of imprisonment for punitive purposes distinguishes criminal from civil sanction. *See State v. Anton,* 463 A.2d 703, 706 (Me.1983); *Brown v. Multnomah Co. Dist. Ct.,* 280 Or. 95, 570 P.2d 52, 57–58 (1977). The highly regarded Justice Hans Linde of the Oregon Supreme Court observed:

> The prescribed penalty is generally regarded as the single most important criterion [in distinguishing between criminal and civil prosecutions], at least when it involves imprisonment. Indeed, "decriminalization" of one-time criminal offenses ordinarily assumes that the sanction of imprisonment must be abandoned.... We agree that "imprisonment" cannot be used as "punishment" for a civil offense.... *Brown, supra,* 570 P.2d at 57; *accord Anton, supra,* 462 A.2d at 706.

The Framers made sure that "every action prosecuted by the people of the state as a party, against a person charged with a public offense, for the punishment of the same, shall be termed a *criminal action.*" Idaho Const. Article 5, § 1 (emphasis added). In Anglo-American practice as a whole, criminal actions always invoke certain procedural protections, including the accused's right to confront witnesses, the right to have no verdicts directed against

the accused, and burden on the state to prove its case beyond a reasonable doubt. Clark, *Civil and Criminal Penalties and Forfeitures: A Framework for Constitutional Analysis,* 60 Minn.L.Rev. 379, 398 (1976). However, as the Framers knew, criminal actions do not always invoke the right to a jury trial in all jurisdictions. *Id.* at 397–99. Criminal actions involving minor offenses without the potential for incarceration may well have been a situation appropriate for summary procedure in the eyes of the Framers. Clearly the Framers in 1890 could not have foreseen the future necessity of traffic infractions—offenses so minor that the legislature would consider them civil and would enforce them with only fines of no more than $100.

The label "criminal action", as opposed to "civil action", in all probability was less important to the Framers than the form of sanction involved. *Cf. Anton, supra,* 463 A.2d at 706 ("That purpose [of decriminalization] may not be achieved, however, by a mere change in the label of the offense."). The debate over Article 1, § 7 reflected a preeminent desire to afford the protection of the right to a jury trial to those faced with the deprivation of freedom. Delegate Poe emphatically declared, "I am unalterably opposed to taking away that safeguard from any living human being, to-wit, a trial by twelve of his peers when he is accused of a crime the penalty of which will incarcerate him in a prison cell." *Proceedings and Debates of the Constitutional Convention of Idaho* 242 (1889); *see also id.* at 152, 242, 255, 257–58.

George Kaye, a commentator on the right to jury trial under the federal constitution, argued that Article III, § 2 and the Sixth Amendment were designed to guarantee a jury in situations involving possible imprisonment:

> But it is only where personal liberty is involved that the jury guarantees of Article III and Amendment VI come into play. Alexander Hamilton said that the friends of the plan of the Federal Convention, who as to this matter constituted the more conservative group, regard-

ed the trial by jury "as a valuable safeguard to liberty." Hamilton's further elucidation of the topic in *The Federalist* clearly shows that the jury assurance of Article III was designed, in accordance with the attitude of the time, to secure personal liberty, and that the protection of private property was left to Congressional statutory regulations. Thus he writes:

> I cannot readily discern the inseparable connection between the existence of liberty and the trial by jury in civil cases. Arbitrary impeachments, arbitrary methods of prosecuting pretended offenses, and arbitrary punishments upon arbitrary convictions, have ever appeared to me to be the great engines of judicial despotism; and these have all relation to criminal proceedings. The trial by jury in criminal cases, aided by the *habeas-corpus* act, seems therefore to be alone concerned in the question. And both of these are provided for, in the most ample manner, in the plan of the convention. Kaye, *supra,* 26 U.Chi.L.Rev. at 274–75 (footnotes omitted).

Judging from the concerns voiced at the convention, the Framers of the Idaho Constitution shared the concerns and desires of Hamilton.

■ Taking into account the universal right under territorial law to a jury trial whenever imprisonment threatened, the fact that imprisonment distinguishes criminal sanction, and the ardent desire of the Framers to interpose juries on the road to the prison cell, we conclude that Article 1, § 7 guarantees a jury trial whenever the possible sanction includes imprisonment. Many other jurisdictions have reached the same or a similar result under their constitutions. *City of Pasco, supra,* 653 P.2d at 625 (Wash.); *Anton,. supra,* 463 A.2d at 706 (Maine); *Hendershot, supra,* 263 S.E.2d at 95 (W.Va.); *Franklin, supra,* 576 S.W.2d at 623 (Texas); *Burnett, supra,* 223 N.W.2d at 112 (Mich.); *Mills v. Municipal Court,* 10 Cal.3d 288, 110 Cal.Rptr. 329, 336, 515 P.2d 273, 280 (1973); *Becker, supra,* 287 A.2d at 581–82 (Vermont); *Bak-*

*er, supra,* 471 P.2d at 401 (Alaska); *Peterson, supra,* 153 N.W.2d at 830 (Minn.); *Voss, supra,* 149 N.W.2d at 597 (Wisc.); *Bolkovac v. State,* 229 Ind. 294, 98 N.E.2d 250, 252 (1951). As with these jurisdictions, the Idaho Constitution utilizes juries as a safeguard against unjust imprisonment.

■ This is not to say that crimes not potentially punishable by imprisonment never fall under the requirements of Article 1, § 7. The Framers expressed some concern for the deprivation of property rights as well as liberty without the benefit of a jury trial. *Proceedings and Debates of the Constitutional Convention of Idaho* 152, 158, 229 (1889). Means of sanction other than imprisonment, such as fines and the deprivation of privileges or offices, if serious and substantial enough, can rise to the level of criminal sanction. *Brown, supra,* 570 P.2d at 57–60. At some point the sanction crosses the line between remedial, regulatory, compensatory, or coercive, and becomes punitive. *Id.; Anton, supra,* at 706 ("In theory, a criminal sanction serves to 'punish' an individual for violating a legal norm, while civil sanctions serve to coerce, regulate or compensate. *Clark, supra,* 60 Minn.L.Rev., at 429–32, 475, n. 10."). In such a case, Article 1, § 7 would apply. The measure to look to in judging whether or not a sanction is punitive is the maximum penalty. *Baldwin, supra,* 399 U.S. at 68, 90 S.Ct. at 1887; *State v. Smith,* 99 Nev. 806, 672 P.2d 631, 633 (1983); *State v. Grimble,* 397 So.2d 1254, 1256 (La.1980).

Citing extensive authority, the Maine Supreme Court has concluded, "Monetary fines that are reasonable in the circumstances have been deemed civil in nature on the ground that they have a remedial rather than punitive purpose." *Anton, supra,* 463 A.2d at 707. "In effect," observed the court, "the fine serves as a form of damages for the state's enforcement costs." *Id.* at 707. This assessment must be conducted under contemporary standards.

*Clawans, supra,* 300 U.S. at 627, 57 S.Ct. at 663.

Collateral consequences such as loss of a driver's license may or may not constitute a criminal sanction. Justice Linde explained:

No similar significance [as with imprisonment or large fines] attaches to the direct or collateral suspension or revocation of a driver's license for a traffic offense. The offense does not become "criminal" rather than "civil" merely because the loss of a license is a great inconvenience, so long as the suspension or revocation reflects a legislative, judicial, or administrative judgment that a traffic offender should not continue to drive. Again the question is whether the deprivation is regulatory or another form of punishment, as for instance its imposition for nonpayment of a fine,.... *Brown, supra,* 570 P.2d at 58 (citation and footnote omitted).

In some cases, revocation may be necessary to protect the safety of the public. *Anton, supra,* 463 A.2d at 707.

An indicator of punitive intent, as one commentator concluded, "is the judgment of community condemnation which accompanies and justifies its imposition." Hart, *The Aims of Criminal Law,* 23 Law & Contemp.Prob. 401, 404 (1958). While the stigmatizing or condemnatory character of a sanction may be difficult to determine, such character may at times surface in the language of the statute concerned or in legislative history. *Brown, supra,* 570 P.2d at 59–60.

Finally, whether or not the accused is subject to arrest and detention "bears on the constitutional distinction" between criminal and civil sanction. *Brown, supra,* 570 P.2d at 60; *accord, Anton, supra,* 463 A.2d at 708. Arrest and detention is something more than what occurs when a police officer stops a vehicle to enforce a traffic infraction:

Of course a traffic offender must be subject to being stopped.... But detention beyond the needs of identifying, citing, and protecting the individual or "grounding" him, especially detention

for trial unless bail is made, comports with criminal rather than with civil procedure and is surely so perceived by the public. *Brown, supra,* 570 P.2d at 60; *accord, Anton, supra,* 463 A.2d at 707–08.

■ To summarize, Article 1, § 7 provides for trial by jury for all public offenses which are potentially punishable by imprisonment. Although the prosecutions of all public offenses are criminal actions, Idaho Const. Article 5, § 1, and all criminal actions required jury trials at the time of statehood, we believe Article 1, § 7 has sufficient flexibility to allow for summary proceedings if the *sanction* is decriminalized. Imprisonment is inherently a criminal sanction. Other sanctions may be characterized as criminal depending on their punitive intent. Punitive intent can be shown by the size of a potential fine, the eventuality and nature of losses of privileges, evidence of stigma and condemnation in the language of the statute and/or legislative history, and the potential for arrest and detention. We make no attempt to weigh these relatively; nor do we rule out the possibility of other indicators of punitive intent.

D. *The Constitutionality of the ITIA in This Case.*

■ Under the test set out above, the provisions of the ITIA challenged by Bennion easily pass muster. The infraction of which Bennion was accused was not punishable by imprisonment. I.C. §§ 49–3401(3) and 49–3406. Even if Bennion refuses to pay the fine imposed, the worst he will suffer is the suspension of his license, not imprisonment. I.C. § 49–3408. The "imprisonment factor" is the most important hurdle.

The sanction imposed, a fine not exceeding $100, does not rise to the level of a punitive, criminal sanction. In light of the decisions in other jurisdictions, $100 appears to be reasonable and thus remedial rather than punitive in nature. *Cf., Anton, supra,* 463 A.2d at 706–07 (possible fine of $250 for traffic infraction held non-crimi-

nal); *People v. Oppenheimer*, 42 Cal. App.3d Supp. 4, 116 Cal.Rptr. 795, 797–99 (1974) (possible fine of $50 for first conviction up to $250 for third conviction of traffic infraction held to be of "petty" nature); *State v. Shak*, 51 Haw. 612, 680, 466 P.2d 422, 423–25 (1970) (maximum fine of $200 for traffic infraction held to be of "petty" nature).

The legislature gave a number of indications that its intent was to impose a non-criminal non-punitive sanction. Its labeling of infractions as "civil," though ineffective in light of Article 5, § 1, is one indicator. A second is found in the legislative statement of purpose of the ITIA, which articulated the intent "to remove jail sentences and jury trials from all of the non-serious motor vehicle offenses." Statement of Purpose, R.S. 7129, H.B. 343 (1981). A third is reflected in the fact that if Bennion refuses to pay the fine, he will only be subject to having his license suspended. I.C. § 49–3408. "Such a suspension is not punitive but acts as a coercive measure in the nature of a civil sanction." *Anton, supra*, 463 A.2d at 707. The Idaho legislature obviously did not view traffic infractions as worthy of stigma or condemnation.

Nor was, or is, Bennion subject to arrest and detention, even upon failure to pay his fine. *See* I.C. § 49–1109. "The fact that a motorist charged with a traffic infraction ... is not subject to a full-custody arrest [but only being temporarily stopped in order to be cited] comports with civil rather than criminal process." *Anton, supra*, 463 A.2d at 708.

### E. *Conclusion.*

At the time the Idaho Constitution was ratified, there existed no class of "petty" criminal offenses triable without a jury. However, Article 1, § 7 did not preclude the possibility of summary procedure for a future class of offenses, so long as the offenses were not punishable by imprisonment or other criminal sanction. In providing for summary proceedings only in the case of traffic infractions—subject not to imprisonment but only to a thoroughly de-criminalized sanction of maximum fine of $100—the legislature was true to the intent and scope of Article 1, § 7. The decision of the district court is affirmed.

DONALDSON, C.J., and SHEPARD and BAKES, JJ., concur.

DONALDSON, Chief Justice, specially concurring.

I feel it necessary to specially concur so as to answer some of the allegations contained in Justice Bistline's opinion. The first allegation is that there was improper involvement by the Court in the drafting of the 1982 Traffic Infractions Act. Article 5, § 2 of the Idaho Constitution states that the courts shall constitute a unified and integrated judicial system for administration and supervision by the Supreme Court. Article 5, § 25 of the Idaho Constitution requires the justices of the Supreme Court to report defects and omissions in the laws annually to the governor to be transmitted to the legislature. Since territorial days, the Supreme Court has reported defects in the laws to the legislature, and in the case of the Idaho Traffic Infraction Act, this was done. On November 17, 1981 the "Defects in the Laws Letter," of the Supreme Court pointed out the need for technical amendments to the original Traffic Infractions Act of 1981. The Idaho Traffic Infractions Act originally was passed during the First Regular Session of the 46th Idaho Legislature in 1981. That original Act, HB 343, 1981 Idaho Session Laws, Chapter 223, was proposed without any involvement by the judicial branch of government. The original 1981 Act was drafted and proposed by the Idaho Prosecuting Attorneys Association, and that Association presented and explained HB 343, at various legislative committee hearings. The only judicial involvement with HB 343 during the 1981 legislative session was in identifying a number of serious defects in HB 343, and in recommending to the germane legislative committees, that the bill be amended to change the effective date from the original July 1, 1981, to July 1, 1982, in order to

allow the Legislature to consider correcting the defects identified.

During the 1982 legislative session, the Idaho Legislature adopted a series of amendments to the original HB 541. These amendments were incorporated in HB 541, which went into effect on March 1, 1983. Many of the amendments proposed in HB 541, had been recommended by a special study committee which had been appointed by the Supreme Court to identify defects in the 1981 law. The committee appointed by the Supreme Court included representatives of courts, law enforcement, the defense bar, district court clerks, and the Idaho Association of Cities. HB 541 was debated and revised in four separate meetings of the House Judiciary and Rules Committee, which also took suggestions for amendments from the state Attorney General's office, and the state Department of Transportation (which department was required to implement the amendments).

Justice Bistline's opinion also has suggested that the Supreme Court, as an institution, has a substantial financial interest in the Traffic Infractions Act. This comment deserves correction. Revenues from fines and court costs assessed for traffic infractions are distributed by statute to a number of state and local funds, including the State General Account; the District Court Fund; City General Account; the Public School Income Account; the State Highway Account; and the Peace Officers Standards and Training Account. Not one dime of the revenue from any traffic infraction, cost, fee, or penalty is distributed in any way to the Idaho Supreme Court, or is it directed to the state judicial appropriations.

Finally, Justice Bistline's opinion is incorrect in its suggestion that communicating with and giving advice by administrative personnel of the Court to the legislature involves the Doctrine of Separation of Powers, through judicial exercise of powers reserved to the legislature. Such a view misunderstands the doctrine. Article 2, § 1 of the Idaho Constitution divides the powers of the state government into three distinct departments; the legislative, executive and judicial, and it further provides that "No person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted.

The legislative power is the power to legislate, *i.e.,* enact laws. The presentation to the legislature of suggestions for improvement of the laws does not constitute the act of legislating.

As this Court stated in *Jewett v. Williams,* 84 Idaho 93, 369 P.2d 590 (1962):

"It is the basic powers of sovereignty which must remain separate; not subsidiary activities which include the ascertainment of facts, investigation and *consultation,* the duty of reporting facts *and making recommendations,* for the purpose of carrying out those basic powers. (Emphasis supplied).

The Supreme Court has the constitutional duty and responsibility to recommend amendments to the legislature where it identifies defects or omissions in the laws. It, therefore, will continue to carry out its responsibility to identify defects and to recommend changes in the laws which will assist the legislature in discharging its legislative duties, both when requested or when it deems it in the public's best interest.

BISTLINE, Justice.

I.

Although I strongly doubt whether the infractions legislation, as modified by rules promulgated by the Idaho Supreme Court, passes constitutional muster, I do not dissent from the majority opinion; nor do I join it, being assailed by strong doubts that this Court, as constituted in this case, should be deciding it *at all.* My reason for so believing is that this Court's involvement in the drafting of the 1982 Traffic Infractions Act gives rise to an appearance of impropriety.

Unbeknownst to the plaintiff in this action, and probably unknown to the legislators who voted for and against it, the house bill which became the Traffic Infractions Act, and is now under constitutional challenge as violative of the right to trial by jury, was drafted in the Supreme Court Building by employees of the Supreme Court. The bill was then handed to the House Judiciary Committee which in turn started it on its path toward becoming law. In my view this was an absolutely impermissible violation of the doctrine of separation of powers—a mainstay of our Idaho Constitution, and of most constitutions.[1] My concern was not only with the irregularity of a supreme court drafting legislation, but also with the problem which was bound to arise when a challenge would be made to its constitutionality. That challenge is now before the Court, and the other members of the Court do not hesitate to pass upon the issue of constitutionality.

After the instant case had been taken under consideration, rather than engage in futile discourse, I first considered the possibility of abstaining from any participation by reason of the foregoing considerations. Meanwhile, however, the United States Supreme Court handed down its decision in *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). Upon a full consideration of the judicial philosophy of that case, I was inexorably drawn to the conclusion that at the least the parties to this controversy are entitled to be fully apprised of this Court's

involvement in the history of the litigation at stake, in order that they can make an informed judgment as to any motions believed to be in order. True, there is no *direct* pecuniary interest by any member of this Court. But equally true, the judicial system as a whole benefits indirectly, and, in making budget requests to the legislature, is able to remind the Department of the substantial revenues which the Infractions Act produces each year. This, however, is the least of my serious concerns. My primary concern is simply that the drafting of proposed laws is not the business of the Idaho Supreme Court, but the business of the Idaho legislature. Moreover, that this is true and not in the least debatable is a historical fact as well as a fundamental of our Idaho Constitution.

In 1963 the legislature of this growing state saw the need for a legislative council, and created one. I.C. § 67–427. Section 67–429 is of special significance. Paragraphs (1) and (2) are lightly pertinent; and have not been changed by any amendments:

> **67–429. Powers and duties.**—(1) It shall be the duty of the council to collect and compile information, to draft bills and to conduct research upon any subject which the legislature may authorize or direct or upon any subject which it may determine, provided that all activities of the council must be reasonably related to a legislative purpose. The legislature may make specific assignments to the

---

1. In accordance with that view, I had nothing to do with the Court's drafting of the bill. Similarly, again I declined to participate in any manner when the Supreme Court appointed a committee to promulgate rules which would augment the Infractions Act. Where historically in Idaho, and in keeping with constitutional doctrine, it has been the function of the people, through their legislature, to set the upward and downward limits on fines, terms of imprisonment, and other penalties for those adjudged guilty of public offenses, the actual fine or term of imprisonment or other penalty has been within the discretion of local judges in the particular court having jurisdiction of the offender. A charged offender could plead guilty, or upon conviction following trial, urge upon the court reasons why a small fine or a small jail term, or even proba-

tion, might be in order. Now, under the Act, as I understand its operation, for many offenses the local judge has been divested of all discretion, and the offender is required to pay a fixed fee, including costs, which is preset by the Idaho Supreme Court. It is not only preset by rule of the Supreme Court, but is subject to being changed (hardly ever downward) by the Supreme Court—much as the purchase price of merchandise is regulated to bring in what the market will bear. This Court's involvement in fixing the fine, to the exclusion of the Legislature legitimately setting upward and downward limits, and to the exclusion of allowing lower and local courts to determine the exact penalty to be imposed, too, smacks strongly of being in violation of the separation of powers.

council by a concurrent resolution approved by both houses. (2) The council may hold public hearings and it may authorize or direct any of its committees to hold public hearings on any matters within the jurisdiction of the council.

The legislative council is funded, as I understand it, as a year-round function. The council appoints committees it deems necessary, and those committees may be members of the council and other members of the legislature. It is *directed* to appoint a research director and it may employ such other persons and/or agencies as it deems necessary, or deems desirable. Those employed are given a salary. I.C. § 67–428.

Not being conversant with the activities which are directed by the legislative council, I am given to understand that legislation is drafted under its auspices, and that there is a considerable year-round staff, which is properly funded.[2] In this instance, it was neither a reasonable nor proper function of the Supreme Court to undertake a task as monumental as rewriting legislation which it opined was in need thereof. The legislature's budget is geared for that activity. The Court's budget is not.

Article 5, § 25 of our Idaho Constitution provides, in unmistakably clear language, how far, *and no farther*, the Supreme Court may go in affecting the legislative process. With constant regard for the doctrine of separation of powers the Framers made the governor the intermediary through which the Supreme Court may transmit its observation as to defects or omissions in the laws:

> **Defects in laws to be reported by judges.**—The judges of the district courts shall, on or before the first day of July in each year, report in writing to the justices of the Supreme Court, such defects and omissions in the laws as their knowledge and experience may suggest, and the justices of the Supreme Court shall, on or before the first day of December of each year, report in writing to the governor, to be by him transmitted to the legislature, together with his message, such defects and omissions in the Constitution and laws as they may find to exist.

This section of the Constitution is blatantly violated whenever the Court bypasses the office of the governor.[3] The Court did, in its 1981 letter, properly write to the governor in November of 1981, and did mention defects, and in doing so, disclosed ongoing Court involvement in a strictly legislative area:

TRAFFIC INFRACTIONS ACT AMENDMENTS

The Idaho Traffic Infractions Act is scheduled to take effect on July 1, 1982. A special study committee appointed by the Chief Justice has pinpointed serious technical difficulties with the new Act. That study committee has prepared a detailed report and 60 pages of proposed amendments to the Act to make it workable. These recommendations should be reviewed and considered as early as possible in the 1982 legislative session.

Indeed, where there should have been a legislative interim committee, or the Legislative Council itself, attending to the defective legislation, the Court had entered the field and Chief Justice Bakes had appointed a "study" committee. Chief Justice Bakes did so at the behest of a conclave of administrative judges and trial court administrators. The committee appointed by Chief Justice Bakes in May of 1981 not only did not name a single legislator, but did not

---

2. Chief Justice Donaldson has written responsive to my concerns that "the presentation to the legislature of suggestions for the improvement of the laws does not constitute the act of legislating." I have no quarrel with that as a general statement, but it is not on target. Obviously, we are all aware that any special interest group, *i.e.*, the educators, the onion-growers, the environmentalists, etc., can present desired legislation if they can find a sponsoring legislator who will introduce it. But, and a big but, those groups are not ordained to pass on the constitutionality of the legislation which they propose.

3. Chief Justice Donaldson's opinion may be reporting such a violation where he writes that *while* the 1981 legislature was in session the Court notified legislative committees of defects and thus brought about a one-year delay of the effective date of the 1981 Traffic Infractions Act.

utilize any Legislative Council personnel or resources—nor were any legislators invited to participate.[4] District Judge John Maynard of Lewiston, Idaho, was named "Honorary Chairman," but the designated actual chairman of the committee, and reporter as well, was Mr. Bianchi, the Administrative Director of the Courts. A letter to Judge Maynard from the Chief Justice advised him of his appointment and the nature of the undertakings:

> As you know, the judiciary supported the amendment which delayed implementation of the Idaho Traffic Infractions Act until July 1, 1982. The charge to this committee is to study thoroughly the provisions of the existing Act and to recommend to the legislature during its 1982 session amendments which will make the Act work more smoothly. In this regard I would hope the committee will be able to examine all aspects of the new law, from administrative issues such as the form of the citation/complaint to legal and philosophical issues such as the impact of the Act on county and city ordinances and the role of the judge in the new decriminalized hearings.

The meetings of the committee appear to be only two in number, and the minutes are attached as Appendices A and B. The first meeting, on June 12, 1981, was largely a philosophical discourse whereat those appointed to the committee were supportive of the Chief Justice's program for rewriting the 1981 Traffic Infractions Act. Mr. Lon Davis, who for years has been the Court's one and only staff attorney, was present as liaison to the Supreme Court Criminal Rules Committee. To him would be allotted the burden of undertaking the task.

The committee met again on August 14, 1982, and again shared views, after which:

> The committee voted overwhelmingly to adopt the Lon Davis draft approach of establishing a separate category for infractions and retaining the general criminal case process. It was agreed to at-

tempt to prepare an amending bill to the original House Bill 343 if possible, but that if this proves unworkable, the committee recommends repealing the original Traffic Infractions Act and proceeding with the Lon Davis draft approach.

Mr. Bianchi had earlier "reported on administrative judges to the original committee approach, and then reviewed the [Lon Davis?] July 7 draft which was recommended by the committee."

It was apparently agreed that the approved draft would be sent to the Chief Justice, and also to the Chairman of the Judiciary Committees of the two houses. No thought was given to the constitutional requirement that defects and omissions must be transmitted to the legislature through the office of the governor. This was not a message of defects and omissions, but a message of proposed legislation which would be a far cry from the 1981 Act.

When the proposed legislation came up for discussion in the House Judiciary Committee on January 25, 1982, Mr. Bianchi was there as a guest, and explained the amendments and the Court's involvement in proposing the amendments. When the bill came before the same committee on February 11, 1982, it was argued that the 1981 Act be repealed or the proposed amendments be adopted.

A Mr. Bob Hallstrom spoke in opposition to the bill on the basis of the constitutional right to a trial by jury. Mr. Bianchi stated that although this was not his bill he would try to prepare language that would address the questions raised by the committee and present his recommendations as soon as possible.

At the same committee's February 25, 1982 meeting, Mr. Bianchi was present, and the minutes show what he described as actions of the Court:

AMENDMENTS TO TRAFFIC INFRACTIONS.

---

**4.** It was a committee requested by a few members of the judiciary, and appointed by the Chief Justice. Truly, from that affair would flow a court bill.

Carl Bianchi pointed out that this bill is not a court bill, but the court has attempted to make it workable. These amendments must either be passed or a repeal of last year's law is needed. He referred to the letter from the attorney general regarding the constitutional questions which had been raised earlier in committee. It is his feeling that the answers provided were adequate to remove the objections expressed.

Other people also were allowed to address the committee and their remarks are available, being of public record.

Two days later, March 5, 1982, Mr. Bianchi again addressed the same committee. According to the minutes:

AMENDMENTS TO H. 541 TRAFFIC INFRACTIONS.

Carl Bianchi reported to the committee that the amendments before them had been prepared in response to objections by Bob Hallstrom and the various people who were concerned with the right to a trial by jury. The infraction is now a civil offense, not constituting a crime and is punishable only by a penalty. The criminal rules of procedure will still be followed, giving the public more protection. There is also a major change in the effective date, extending it to March 1, 1983 in the event there is an error in the final preparation and the legislature might need to examine the bill during the next session. Mr. Bianchi stated that he had addressed the concerns regarding bicycle safety, and as amended this is now a good, workable bill.

Of course, insofar as the legislature knows, or anyone else for that matter, when Mr. Bianchi speaks, he is speaking for the Court as a whole—not just the Chief Justice. It is a natural assumption, and one not improperly done. It may have been true that his active participation at a legislative committee meeting had approval of a majority of this Court. That I do not know, nor do I need to know.

The net outcome of the creation of a court committee by Chief Justice Bakes, appointing the Court's Administrative Director as chairman and reporter, and his activities before the house committee would certainly create the impression that this was a Court bill—notwithstanding remonstrances to the contrary. The Supreme Court's spokesman emissary to the legislature—as is certainly the appearance—not only would lead the legislators to believe that the Court itself observed no constitutional infirmity, but also that the attorney general saw no constitutional problems.[5]

In my view, it is a basic sovereign power of the legislature to legislate, and the Court has no authority whatever to participate in that legislative process, although it does have an obligation to transmit observed defects and omissions in the law to the governor, who in turn will pass them on with such comment and recommendation as the governor sees fit.

Where the Court meddles in the legislative process itself, it renders itself disqualified from being the judge of the constitutionality of legislation where in this case it has drafted the legislation in question, implicitly expressing confidence in the constitutional integrity of that legislation, and additionally, by agent, has expressly passed on the question.

It must be remembered that the attorney general was not all that certain as to that question, and did not presume to theorize what the Supreme Court might do.[6] It is to be very much doubted that the attorney general knew of the Court's involvement, or, if knowing, that he saw where his comment would be appropriate.

For my part, I see the opinion of the attorney general as suggesting that there was indeed a constitutional question that might arise, and the answer was an unknown.

---

5. Whether a spokesman for the Court should also pass judgment on an opinion from the attorney general is another question.

6. The opinion of the attorney general is attached as Appendix C.

Conceding after a review of the 1981 Traffic Infractions Act that it was not the best of legislation, why the Court intervened in this particular instance is another big unknown. Why the legislature, with its Legislative Council, staff, and budget of that Council, was not left to its own devices is something to ponder over. The Court sees much legislation which needs to be rewritten. Just the other day at Twin Falls in a medical indigency case, *St. Alphonsus v. Twin Fall County,* Chief Justice Donaldson observed most cogently:

> JUSTICE DONALDSON: Mr. Webb, I have suggested to several counsel sitting where you are, on the appellant's side, that they should get together and try to make some sense out of these statutes. I've talked to—suggested to Mr. Goins and to Mr. Williams, I believe, several— and you're making an argument to the legislature. We're not the legislature. We do the best with what we've got to work with which are the statutes, which are ambiguous, which are inartfully drawn, which have a host of problems, and why can't they get together and try to draft a statute that makes some sense to both parties, no matter how you slice it so everybody knows where they're going.

That was exactly what Chief Justice Bakes should have been telling these administrative judges and trial court administrators when they wanted the Court to get into the legislative act. Where the final paragraph of the attorney general's opinion in and of itself should have caused a post-haste retreat, on the contrary, the Court's emissary, fully warned that the Court itself would be faced with a very difficult question, went boldly ahead. By that time one would suppose there would have arisen, unfortunately, a certain pride of accomplishment.

The better course for the legislature to have taken would have been to eschew the benefit of the Court's helpful hand, and taken Attorney General Leroy's suggestion that a constitutional amendment be proposed to the 1982 electorate. As it turned out, if recollection serves me correctly, every proposed amendment was ratified.

Only because of interest, I am adding a Part II which may be informative to the public, and might have been part of a dissent from the issue decided today, other than that the Court has done what it has done, and all the dissents in the world will not turn it one whit.

Questions as to impartiality are particularly important in a case as close as this one. Although the majority opinion does provide what appears to be a careful and thorough analysis, that same analysis just as easily could have brought about the opposite result. Briefly, I will endeavor to demonstrate.

Whether or not the *punishment* imposed by the Infractions Act can be characterized as "criminal" or "noncriminal," the fact remains, as the majority concedes, that an *offense* is criminal. The majority itself notes that the legislature's "labeling of infractions as civil" was "ineffective in light of Article 5, § 1...." Consequently, where Article 1, § 7 mandates a jury trial for all criminal actions, then it would mandate a jury trial no matter how light the potential punishment. Admittedly, Article 1, § 7 does not *explicitly say* that the right to a jury trial attaches to all criminal prosecutions. However, as the majority carefully documents, the right to a jury trial did attach to all criminal prosecutions at the time the Constitution was framed. The facts that the system in 1890 guaranteed a jury for all criminal prosecutions and that Article 1, § 7 mandates that this right "shall remain inviolate," argues for a right to jury trial for all criminal prosecutions, no matter whether the penalty is jail time or, more severe, a fine coupled with the threat of confiscation of an offender's driver's license—a most vicious sanction, and one which heretofore was properly reserved for drunk drivers.

The following observation by the majority supports me in this brief comment:

> Article 1, § 7 also included the following language: "[T]he legislature may provide that in all cases of misdemeanors five-sixths of the jury may render a ver-

dict. A trial by jury may be waived in all criminal cases not amounting to felony, by the consent of both parties, expressed in open court...." The implication of the first sentence as quoted is that in "all cases of misdemeanors" there is the right to a jury, five-sixths of which may render a verdict. The implication of the second sentence is that "in all criminal cases" there is a right to a jury, which may be waived in the case of non-felony cases. The inferred intention to afford a jury trial in every criminal case, whether involving a serious or a petty offense, would be consistent with the provisions of the territorial statutes at the time of statehood. Majority op. at 49–50, 730 P.2d at 969–70.

If the Framers intended "to afford a jury trial in every criminal case, whether involving a serious or a petty offense," then there would be a right to a jury trial for traffic infractions.

I agree with the majority that the Framers wished to involve the jury in standing between the state and the prison cell. It does not necessarily follow, however, that the Framers' concern ended at that point. The Framers might well have believed that the conviction of any crime sufficiently indicated "community condemnation" and "punitive intent" to warrant a jury.

The Act creates a novel category of offenses (formerly misdemeanors with misdemeanor penalties of fine and imprisonment). The Act stated in a number of places that penalties would never include *any* incarceration. Yet, under the Act as amended by the Court rules, where formerly an offender would have the option of paying his fines or "sitting it out" in jail at so much per day, now, under the Infractions scheme, the offender who does not pay his fine will find his driving privileges suspended until he does so. Further, if his driving license has been suspended—*no hearing allowed*—then the offender is guilty of an offense as often as he does so, and is thereby eligible for a great deal of jail time—and still owes the money.

My point is not so much to disagree with the result reached today. The majority makes a strong case for excepting from Article 1, § 7 those offenses now punishable as so-called civil offenses even though they technically are criminal in nature. There also is the unspoken concern over the onerous burden the state would bear if it was obligated to afford a jury to every person cited for a traffic infraction. My point is to illustrate the difficulty of the question presented by a case where this Court as a whole is not above suspicion by reason of the impermissible drafting of legislation; especially does this seem so where there has been no disclosure—leaving that sad duty to this writer who did not participate, but nevertheless stands as suspect as the rest.

I do not suggest that the members of this Court are incapable of a detached, impartial review of the constitutionality of legislation drawn under high judicial auspices. There is, however, the danger of the *appearance* of impropriety.

### II.

Just prior to the Constitutional Convention, the Fourteenth Session of the Territorial Legislature codified all existing laws into the 1887 Revised Statutes of Idaho. Title VIII thereof was entitled:

OF CRIMES AGAINST THE PERSON AND AGAINST PUBLIC DECENCY AND GOOD MORALS [public offenses].

Apparently not a well-known fact by the other members of the Court, there were even in those early territorial days public highways, and laws criminalizing certain conduct on and/or in connection with those highways. A five-minute effort produces a few of the following offenses which the legislature itself deemed necessary in regard to the highways:

**Sec. 6928.** Every person driving any conveyance drawn by horses, upon any public road or way, who causes or suffers his horses to run, with intent to pass another conveyance, or prevent such other from passing his own, is guilty of a misdemeanor.

**Sec. 6922.** Every person not exempt from pay tolls, who crosses on any ferry or toll bridge, or passes through any toll gate, lawfully kept, without paying the toll therefor, and with intent to avoid such payment, is punishable by fine not exceeding twenty dollars.

**Sec. 6923.** Every person in charge of a locomotive engine, who, before crossing any traveled public way, omits to cause a bell to ring or steam whistle to sound at the distance of at least eighty rods from the crossing, and up to it, is guilty of a misdemeanor.

**Sec. 6924.** Every person who is intoxicated while in charge of a locomotive engine, or while acting as conductor or driver upon any railroad train or car, whether propelled by steam or drawn by horses, or while acting as train dispatcher or as telegraph operator, receiving or transmitting dispatches in relation to the movement of trains, is guilty of a misdemeanor.

**Sec. 6882.** Any owner, or other person in charge of any herd or drove of live stock who willfully or negligently injures any resident of the Territory by driving or moving such herd or drove from any public highway, and herding or grazing the same on land occupied and improved by any settler in possession of the same is guilty of a misdemeanor.

**Sec. 7135.** Every person who maliciously removes or injures any mile board, post, or stone, or guide post, or any inscription on such, erected upon any highway, is guilty of a misdemeanor.

**Sec. 7138.** Any person who obstructs, injures, or damages any public road, street or highway, either by placing obstruction therein or by digging in, deepening or deviating the water of any stream, or by placing any obstruction in any ditch or stream within or along any public road, street or highway, or by placing or constructing any obstruction, ditch or embankments upon their own or other lands, so as to make or cause any water to flow upon or impair any public road, street or highway, or rides or drives upon and along the sidewalk of any road, street or highway, whenever such sidewalk has been graded or graveled, located designated by any order of the Board of Commissioners or city council, or prepared in any other manner dedicating and designating the same for and to that particular use and purpose, either by the property owner or by the public, or in any other manner injures or obstructs any public road, street or highway, is guilty of a misdemeanor.

**Sec. 7139.** Any person who runs water across any public highway, road or street, without first constructing a good and sufficient ditch or ditches to convey the same, who fails to bridge such ditch or ditches, or to keep such bridge or bridges, or ditches in good repair, and all persons, companies or corporations who suffer any water used by them for the purpose of irrigation, or any other purposes, to flow into or upon any public highway, road or street, in any other manner than that authorized by law, is guilty of a misdemeanor, and upon conviction thereof must be fined in any sum not less than twenty-five nor more than fifty dollars, together with the costs of suit, and for a second offense, double said fine and costs; and it is hereby made the duty of all road supervisors, constables and marshals, to make complaint before the proper court, for violations of this section, whenever notified or having knowledge thereof.

What of *public offenses* before the Constitution was adopted? No different than as provided in the Constitution. The 1887 Revised Statutes tell us this.

**Section 7480.** *Every person is liable to punishment* by the laws of this Territory, for a *public offense* committed by him therein, except where it is by law cognizable exclusively in the courts of the United States.

**Sec. 7481.** When *the commission of a public offense*, commenced without the Territory, is consummated within its boundaries, the defendant is liable to punishment therefor in this Territory, though he was out of the Territory at the

time of the commission of the offense charged. If he consummated it in this Territory through the intervention of an innocent or guilty agent, or any other means proceeding directly from himself, in such case the jurisdiction is in the county in which the offense is consummated.

Sec. 7482. When an inhabitant or resident of this Territory, by previous appointment or engagement, fights a duel or is concerned as second therein, out of the jurisdiction of this Territory; and in the duel a wound is inflicted upon a person, whereof he dies in this Territory, the jurisdiction of the offense is in the county where the death happens.

Sec. 7483. When a *public offense* is committed in part in one county and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county.

Sec. 7484. When a *public offense* is committed on the boundary of two or more counties, or within five hundred yards thereof, the jurisdiction is in either county.

What was the procedure in Idaho before the Constitution was adopted? Much as it has been since statehood, almost 100 years, and up until the enactment of the Traffic Infractions Act:

## PART II.—OF CRIMINAL PROCEDURE [1887 R.S.].

**Section 7350.** *No person can be punished for a public offense,* except upon a legal conviction in a court having jurisdiction thereof.

Sec. 7351. Every public offense must be prosecuted by indictment, except:

1. Where proceedings are had for the removal of civil officers of the Territory;

2. Offenses arising in the militia when in actual service, and in the land and naval forces in time of war, or which this Territory may keep, with the consent of Congress, in time of peace;

3. Offenses tried in Justices' and Probate Courts.

Sec. 7352. *The proceedings by which a party charged with public offense is accused and brought to trial and punishment, is known as a criminal action.*

Sec. 7353. *A criminal action is prosecuted* in the name of the Territory of Idaho, as a party, *against the person charged with the offense.*

Sec. 7354. *The party prosecuted in a criminal action, is* designated in this Code as *the defendant.*

Sec. 7355. In *a criminal action* the defendant is entitled:

1. To a speedy and public trial;

2. To be allowed counsel as in civil actions, or to appear and defend in person and with counsel.

Sec. 7356. No person can be subjected to a second prosecution for a public offense for which he has once been prosecuted and convicted or acquitted.

Sec. 7357. No person can be compelled in a criminal action, to be a witness against himself, nor can a person charged with a public offense, be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge.

Sec. 7358. *No person can be convicted of a public offense unless by the verdict of a jury,* accepted and recorded by the court, or upon a plea of guilty, or upon a judgment of a Probate or Justice's Court, a jury having been waived, in a criminal case not amounting to a felony.

Not only were there those particularly pertinent misdemeanor offenses which are first set out above, but a whole host of other misdemeanors, some of which many people of the time (and likely even now) probably thought should not have been *public offenses,* but rather so-called "petty offenses," a category which at that time had absolutely no recognition in Idaho. These are found in the General Index to the Revised Statutes:

**56**

aiding or advising commission of suicide .............................. 6932
adulterating food, drugs, liquors, etc. ................................ 6918
altering telegraph messages ........................................... 7168
animals, poisoning .................................................... 7152
assaults defined ...................................................... 6727
assaults by officer under color of authority .......................... 6516
attempts to vote, not being qualified ................................. 6357
attempts to extort by verbal threats .................................. 7086
attorney defending certain cases ...................................... 6525
attorney buying demands in suit ....................................... 6524
refusal to pay over money collected for another ....................... 6523
burning or injuring rafts ............................................. 7163
barratry, common ...................................................... 6521
battery defined ....................................................... 6729
betting on elections .................................................. 6366
bridge or ferry, crossing without paying tolls ........................ 6922
burglarious tools, having ............................................. 7022
buying appointment to office .......................................... 6386
buying demands in suit, by attorney ................................... 6524
catching fish by poisonous substances ................................. 7197
changing telegraphic messages ......................................... 7168
child, omission to furnish necessaries to ............................. 6782
clandestinely learning contents of message ............................ 7207
compounding offenses .................................................. 6518
consignee, etc., making false statement ............................... 7099
criminal contempts .................................................... 6529
criminal conspiracy ................................................... 6540
dead animals, putting in streets and rivers, etc. ..................... 6914
deadly weapons, rudely exhibiting ..................................... 6961
deadly weapons, having ................................................ 7023
deer, killing ......................................................... 7185
defacing or removing landmarks ........................................ 7160
destroying evidence ................................................... 6502
director of corporation, misconduct of ................................ 7117
disclosing contents of telegraphic message ............................ 7167
disturbing religious meetings ......................................... 6820
disturbing peace ...................................................... 6959
dog and cock fighting ................................................. 6958
elections, attempt to vote not being qualified ........................ 6357
elections, betting on ................................................. 6366
elections, intimidating, corrupting, etc., electors ................... 6364
elections, judge of unfolding or marking ticket ....................... 6360
elections, procuring illegal voting ................................... 6358
elections, refusal by voter to be sworn ............................... 6355
elections, refusal to answer questions by officers of ................. 6355
escape from prison other than territorial ............................. 6454
evidence, destroying .................................................. 6502
exposure, indecent, person, pictures, etc. ............................ 6840
exposure of persons having contagious disease ......................... 6927
exposure, threatening by letter ....................................... 7210
fighting duel, posting for not ........................................ 6714
fire, setting, to woods, etc. ......................................... 6921
fish, catching out of season .......................................... 7193
fish, catching by poison ....................................... 7192, 7197
fish, catching by permanent contrivances .............................. 7193
forcible entry and detainer ........................................... 6962
forcible entry, returning to retake ................................... 6963
frauds, by debtor concealing property ................................. 6519

frauds, by defendant in same ....................................... 6520
frauds, by personation .............................................. 7093
frauds, in conveyancing ............................................. 7095
frauds, in obtaining money, false pretense .......................... 7096
frauds, in weights and measures .................................... 7107
frauds in stock subscriptions ....................................... 7114
frauds in using name in prospectus ................................. 7116
gambling defined, etc. .............................................. 6850
gambling permitted in house ........................................ 6851
game laws, violating ................................................ 7185
glanders, neglecting to kill animal having ......................... 6933
grand jurors, acting after challenge allowed ....................... 6527
grand jurors, disclosing transactions of ........................... 6532
grand jury, disclosing fact of indictment found .................... 6531
gunpowder, keeping unlawfully ...................................... 6915
illegal marriage .................................................... 7092
imprisonment, false ................................................. 6721
injuring gas and water pipes ........................................ 7171
injuring levees, etc. ............................................... 7162
injuring mile-stones and guide-boards .............................. 7132
injuring standing crops ............................................. 7159
injuring telegraph lines ............................................ 7136
injuring toll-houses, etc. .......................................... 7134
injuring works of art ............................................... 7170
intoxication, malpractice by physician from ........................ 6860
intoxication, engineer .............................................. 6924
keeping disorderly house ............................................ 6842
keeping pest house within certain limits ........................... 6913
larceny petit ....................................................... 7049
larceny of water .................................................... 7059
legislature, witness refusing to testify before .................... 6414
libel defined ....................................................... 6737
libel, threats to publish ........................................... 6745
license, doing business without ..................................... 6983
malicious injuries to freehold ...................................... 7158
malicious mischief .................................................. 7150
nuisance, maintaining ............................................... 6912
oath, refusing to take, when offering to vote ...................... 6355
obstructing public highway .......................................... 7138
running water on highway ............................................ 7139
officer, concealing person from writ ............................... 6878
officer, cruel treatment of lunatics ............................... 6875
officer, delay in presenting arrest to magistrate .................. 6512
officer, disclosing evidence before grand jury ..................... 6532
officer, disclosing fact of indictment found ....................... 6531
officer, exercising duties of, wrongfully .......................... 6388
officer, escape from ................................................ 6454
officer, extortion by executive ..................................... 6383
officer, extortion in fees .......................................... 7083
officer, failure to pay over fines ................................. 6978
officer, false representations to assessor ......................... 6979
officer, inhumanity to prisoners ................................... 6514
officer, making false certificate .................................. 6530
officer, making false return of same ............................... 6874
officer, making unlawful arrest .................................... 6513
officer, misconduct of, corporation ................................ 7117
officer, neglect or violating duty by public administrator ......... 6511
officer, neglecting to disperse rioters ............................ 6956

58

officer, neglecting to prevent duel...................................... 6715
officer of bank, insolvent, receiving deposit............................ 7119
officer of savings bank overdrawing account .......................... 7118
officer, omission of duty by............................................ 6534
officer, publishing false report of condition of corporation............ 7121
officer, purchasing judgment........................................... 6435
officer, receiving excessive fees ...................................... 6432
officer, reconfining person discharged ................................ 6877
officer, refusing inspection of books of corporation .................. 7122
officer, refusing to arrest persons charged with crime ............... 6510
officer, refusing to aid in making arrest.............................. 6517
officer, refusing to issue or obey a writ of habeas corpus ........... 6876
officer, resisting..................................................... 6382
officer, resisting public ............................................. 6515
officer, retaking goods from custody of .............................. 6447
officer, solemnizing illegal marriage ................................. 6873
officer, who beats a person under color of authority.................. 6516
oleomargarine ....................................................... 6917
omission to furnish child necessaries ................................ 6782
omissions to label drugs ............................................. 6916
omissions of duties by officer........................................ 6534
omissions of legal obligations ....................................... 6534
opening or publishing sealed letters ................................. 7166
opening telegraph messages........................................... 7169
penalty, when none, punishment is fixed.............................. 6535
poisoning animals..................................................... 7152
postponing telegraphic messages ..................................... 7205
procuring warrant of arrest maliciously .............................. 6533
putting dead animals in streets ...................................... 6914
racing on highways.................................................... 6928
railroads, engineer intoxicated....................................... 6924
railroads, neglecting to ring bell ................................... 6923
railroads, putting passenger cars in front of freight ................ 6926
railroads, employes violating duties.................................. 6921
railroads, offenses upon and against.......................... 7212–7214
remaining after being warned......................................... 6955
refusing to disperse on lawful command............................... 6960
removal of mortgaged property ....................................... 7100
rescuing prisoner from custody ...................................... 6446
riot defined, etc..................................................... 6950
riot, neglect of officer to disperse.................................. 6956
rout defined, etc..................................................... 6952
search warrants maliciously procured................................. 6533
selling coal, hay, etc., of short weight.............................. 7109
selling liquors at camp meetings ..................................... 6821
selling opium for smoking ............................................ 6831
selling tainted food ................................................. 6919
sending letter, threatening to expose ................................ 7210
ship, setting adrift.................................................. 7163
Sunday, disturbing religious meetings on ............................. 6820
taking or obstructing water in flume, etc............................. 7137
taxes, refusing to give tax collector name of employe................ 6982
taxes, illegally delivering receipts for poll ........................ 6980
tearing down fences, etc.............................................. 7160
tearing down notices.................................................. 7164
telegraph messages, altering ......................................... 7168
telegraph information, using ......................................... 7206
telegraph message, postponing out of turn ........................... 7205

telegraph message, clandestinely learning contents .................... 7207
telegraph message, forging ......................................... 7032
trade-marks, counterfeiting.......................................... 6862
trade-marks, selling goods with counterfeit .......................... 6863
unlawful assembly.................................................. 6953
using information fraudulently obtained from telegraph messages ..... 7206
vagrancy .....................................................7208, 7212
witness before legislature ......................................... 6414
witness preventing attendance of.................................... 6503

When the Constitution was adopted, did any of the language out of the 1887 Revised Statutes find its way into that document? Yes. All of art. 1, § 7, and some of art. 5, § 1:

**Article 1, § 7.** *Right to trial by jury.* —The right to trial by jury shall remain inviolate; but in civil actions, three-fourths of the jury may render a verdict, and *the legislature may provide that in all cases of misdemeanors five-sixths of the jury may render a verdict. A trial by jury may be waived in all criminal cases not amounting to felony,* by the consent of both parties, expressed in open court, and in civil actions by the consent of the parties, signified in such manner as may be prescribed by law. In civil actions the jury may consist of twelve or of any number less than twelve upon which the parties may agree in open court. *Provided, that in cases of misdemeanor* and in civil actions within the jurisdiction of any court inferior to the district court, *whether such case or action be tried in such inferior court or in the district court, the jury shall consist of not more than six.*

**Article 5, § 1.** *Forms of actions abolished.*—The distinctions between actions at law and suits in equity, and the forms of all such actions and suits, are hereby prohibited; and there shall be in this state but one form of action for the enforcement or protection of private rights or the redress of private wrongs, which shall be denominated a civil action; and *every action prosecuted by the people of the state as a party, against a person charged with a public offense, for the punishment of the same, shall be termed a criminal action.*

Feigned issues are prohibited, and the fact at issue shall be tried by order of court before a jury. (Emphasis added.)

An important historical note is that after the people of Idaho ratified the Constitution, the Act of Congress which admitted Idaho to the Union (26 Stat.L. 215, ch. 656) by Section 21 thereof provided:

**Territorial officers, continuance in office—Territorial laws, continuance in force.**—Until the state officers are elected and qualified under the provisions of the constitution of said state, the officers of the territory of Idaho shall discharge the duties of their respective offices under the constitution of the state, in the manner and form as therein provided; and *all laws in force, made by said territory, at the time of its admission into the union, shall be in force in said state, except as modified or changed by this act or by the constitution of the state.*

Ten years passed after Idaho became a state during which time there was no change in the laws of 1887 which were in place when Idaho became a state. Conveniently, the next compilation of the Idaho statutes, the 1901 Annotated Codes, also provided in the index a list of the public offenses which had been and remained misdemeanors:

MISDEMEANORS, LIST OF.

Abstracts of title; engaged in making without filing bond ........... 5112
Adulterated candy, selling....................................... 4745–4746
Adulteration of food, drugs, liquor, etc. ............................. 4747
Adulterating food, drugs, liquors, etc. ............................... 4747

**60**

Altering telegraph messages ........................................... 5102
Animals, poisoning.................................................... 5081
Any clerk receiving fine or forfeiture on judgment, duty of ........... 4788
Assaults defined...................................................... 4896
Assaults by officers under cover of authority......................... 4663
Assessor; listing property for less than cash value .................. 4794
Attempts to extort by verbal threats ................................. 4990
Attempts to vote not being qualified ................................. 4569
Attorney prosecuting; duty to prosecute assessor, when ............... 4795
Attorney prosecuting; failing to prosecute assessor, when............. 4795
Attorney, defending certain cases ......................... 4670, 4671, 4672
    misconduct by .................................................... 4672
Barratry, common ..................................................... 4668
    defined........................................................... 4668
Bond by abstract; failing to file .................................... 5112
Buffalo or bison; person having in possession any part of ............ 4841
Burning, etc., telegraph or telephone poles .......................... 5037
Burning or injuring rafts ............................................ 5085
Betting on elections ................................................. 4578
Bridge or ferry, maintaining without a license ....................... 4802
    crossing without paying tolls..................................... 5031
Broker, commission merchant or consignee making false statements ... 4997
Burglarious tools having ............................................. 4936
Buying appointments to office ........................................ 4599
Buying demands in suit, by attorney .................................. 4671
Buying, taking or accepting opium for smoking......................... 4709
Canal or ditch; damaging, etc......................................... 5044
Candidate voted for; divulging name of elector voting for, penalty .... 4591
Caribou, moose; killing, ensnaring, etc.......................... 4815–4821
Cash value; assessor listing property for less ....................... 4794
Catching fish; except for breeding between certain dates ............. 4836
Catching or killing certain fish, etc................................. 4835
Certificate of health of sheep; failure to produce ................... 5075
Chapter XV of the Political Code, relating to vinegar, violation of ..... 4744
Chapter XV of the Political Code, relaring to dental law .............. 4741
Chapter CCXXI of the Penal Code, relating to estrays, violation of .... 5061
Chapter CVI of the Civil Code, relating to irrigation laws, violation of 5026
Changing telegraph messages .......................................... 5102
Child, omission to furnish necessaries to............................. 4692
Cigarettes; selling or giving away to minors ......................... 4768
Clandestinely learning contents of message ........................... 5100
Controller or owner of sheep, failure to dip; neglecting or refusing to file
    statement ........................................................ 5025
Compounding offenses ................................................. 4665
Consignees, etc., making false statements ............................ 4997
Counterfeiting trade marks, etc....................................... 4950
Criminal contempts ................................................... 4676
Criminal conspiracy .................................................. 4686
Crossing inspection line with sheep, duty of deputy inspector......... 5068
Cutting trees ........................................................ 5087
Dams, fixtures, piers, willfully injuring ............................ 5047
Damaging ditch, etc................................................... 5044
Dead animals, putting in streets and rivers, etc. .................... 4730
Deadly weapons, rudely exhibiting..................................... 4780
    having ........................................................... 4921
Defacing or removing landmarks ....................................... 5089
Depositing unlawful ballots .......................................... 4592
Deputy inspector, permitting sheep to travel without being examined .. 5071

Destroying evidence .................................................. 4653
Director of corporation, misconduct of ............................. 5013
Diseased sheep; driving into state in violation of governor's proclamation 5063
Disorderly house, keeping .......................................... 4713
Disturbing quietude of neighborhood ................................ 4713
Disclosing contents of telegraphic message ......................... 5101
Disturbing religious meetings ...................................... 4705
Disturbing political meetings ...................................... 5157
Disturbing peace ................................................... 4778
Ditch or canal; damaging, etc. ..................................... 5044
Diverting water from ditch or channel .............................. 5043
Divulging name by judge of candidate voted for by elector .......... 4591
Druggists; violating provisions, laws of this state, relating to liquor .. 4715
Election day, selling liquor on, prohibited ........................ 4581
Elector; divulging name of candidate voted for ..................... 4591
Electric light poles; cutting down ................................. 5037
Electors, attempt to vote not being qualified ...................... 4569
Elections, betting on .............................................. 4578
    disturbing ..................................................... 4577
    intimidating, corrupting, etc., electors ....................... 4576
    officer, judge or clerk of, unfolding or marking ticket ........ 4572
    procuring illegal voting ....................................... 4570
    refusal by voter to be sworn ................................... 4567
    refusal to answer questions by officer of ...................... 4567
Elk; killing, wounding, ensnaring, etc. ............................ 4817
Engaged in making abstract of title without first filing bond ...... 5112
Escape from prison other than state ................................ 4623
Evidence, destroying ............................................... 4653
Exhibiting deformed person for hire ................................ 4985
Exposure, indecent, person, picture, etc. .......................... 4718
    of persons having contagious diseases .......................... 4732
    threatening by letter .......................................... 5105
Failing to dip sheep ............................................... 5078
Falsely claiming to hold license or certificate to practice dentistry ..... 4742
Fighting duel, posting for not ..................................... 4891
Fire arms; Indians having possession of off reservation ............ 4853
Fish; catching, except for breeding between certain dates .......... 4836
Fish park; private, trespassing upon ............................... 4843
Forcible entry, and detainer ....................................... 4783
    returning to retake ............................................ 4784
Frauds, by debtor concealing property .............................. 4666
    by defendant in same ........................................... 4667
    by personation ................................................. 4991
    in conveyancing ................................................ 4993
    in obtaining money, false pretense ............................. 4994
    in weights and measures ........................................ 5005
    in stamping casks, etc. ........................................ 5006
    in stock subscriptions ......................................... 5010
    in using name in prospectus .................................... 5012
Gambling, cheating, etc. ........................................... 4846
Getting stray sheep into herd while driving; duty of person driving ... 5077
Glanders, neglecting to kill animal having ......................... 4734
Grand jurors; acting after challenge allowed ....................... 4674
    disclosing transactions of ..................................... 4679
Grand juror disclosing fact of indictment found .................... 4678
Gunpowder, keeping unlawfully ...................................... 4752
Herder sheep; refusing to be sworn by deputy inspector as to condition of
    sheep .......................................................... 5074

**62**

Horticultural inspector; neglect or refusal to comply with orders of ... 4766
House disorderly; keeping, retailing liquors .......................... 4713
Ill-fame house of; admission of minors, etc. .......................... 4691
Imprisonment, false.................................................... 4894
Incompetent persons, issuing license to .............................. 4723
Injury, telegraph pole, etc............................................ 5037
Indians having possession fire arms when off reservation ............. 4853
Injuring, insulator ................................................... 5037
   gas and water pipes ............................................... 5095
   levees, etc. ...................................................... 5048
   mile stones and guide boards ..................................... 5030
   standing crops.................................................... 5088
   telegraph lines .................................................. 5038
   toll houses, etc. ................................................ 5029
   works of art ..................................................... 5094
Inspection lines; driving band or herd of sheep across ............... 5066
Inspector deputy; permitting sheep to travel without being inspected .. 5071
Inspector horticultural; neglect or refusal to comply with orders of ... 4766
Intoxication, malpractice by physician from .......................... 4915
   engineer ......................................................... 4754
Issuing license to incompetent person ................................ 4723
Judge divulging name of candidate for whom elector voted ........... 4591
Keeping disorderly house ............................................. 4713
Keeping pest house within certain limits.............................. 4728
Killing, wounding, ensnaring, trapping or destroying elk ............. 4817
   or maiming animals................................................ 5082
Label genuine, displaying without authority .......................... 5000
Larceny, petit ....................................................... 4958
   of gas ........................................................... 5095
   of water ......................................................... 4968
Legislature, witness refusing to testify before ...................... 4610
Libel, defined........................................................ 4902
   threats to publish ............................................... 4910
License, maintaining bridge or ferry without.......................... 4802
   doing business without............................................ 4802
   auctioneering without ............................................ 4802
Lines inspection; driving band or herd of sheep across ............... 5066
Listing property by assessor for less than cash value................. 4794
License to marry, issuing to incompetent person ...................... 4723
Liquor, selling to Indians ........................................... 4717
Malicious injuries to freehold........................................ 5087
Malicous mischief..................................................... 5079
Minors, selling or giving away cigarettes to ......................... 4767
Minors, selling or giving away spirituous liquors to ................. 4716
Moose, caribou, killing, ensnaring, etc.......................... 4815–4821
Misdemeanor, how punished............................................. 5117
Name or seal; person or association using without authority .......... 5001
Neighborhood, disturbing quietude of ................................. 4713
Neglecting willfully, or refusing to deliver water, etc., from irrigation
   canal............................................................. 5040
Neglect to comply with order of horticultural inspector .............. 4766
   to make return of marriage, etc., penalty......................... 4722
Net or seine, catching fish with...................................... 4835
Nuisance, maintaining................................................. 4764
Oath, refusing to take, when offering to vote ........................ 4567
Obstructing overflow gauge, to increase flow of water................. 5042
   to impede flow of water .......................................... 5041
Officer, concealing person such writ.................................. 4920

cruel treatment of lunatics .......................................... 4917
delay in presenting arrest to magistrate ............................ 4659
disclosing evidence before grand jury ............................... 4679
disclosing fact of indictment found ................................. 4678
exercising duties of office wrongfully .............................. 4601
suffering escape of convict ......................................... 4624
extortion by execution .............................................. 4596
extortion in fees ................................................... 4987
failure to pay over fines, etc. ..................................... 4788
false representation to assessor .................................... 4789
inhumanity to prisoners ............................................. 4661
making false certificate ............................................ 4677
making false return of ............................................. 4631
making unlawful arrest .............................................. 4660
misconduct of directors ............................................ 5013
neglect or violating duty by public administrator ................... 4658
neglecting to disperse rioters ...................................... 4775
neglecting to prevent duel .......................................... 4802
of savings bank, overdrawing account ............................... 5014
of corporation falsifying books ..................................... 5016
omission of duty by ................................................ 4681
publishing false report of condition of corporation ................. 5017
purchasing judgment ................................................ 4617
receiving excessive fees ............................................ 4614
reconfining person discharged ....................................... 4910
refusing inspection of books of corporation ......................... 5018
refusing to arrest person charged with crime ........................ 4657
refusing to aid in making arrest .................................... 4664
refusing to issue or obey a writ of habeas corpus ................... 4918
resisting ........................................................... 4595
resisting public .................................................... 4662
retaking goods from custody of ...................................... 4620
solemnizing illegal marriage ........................................ 4724
who beats a person under color of authority ......................... 4663
Omissions, to furnish child with necessaries ........................ 4692
to label drugs, etc. ................................................ 4736
of duties by officer ................................................ 4681
of legal obligations ................................................ 4681
Owner or controller of sheep, failing to dip ........................ 5078
Overflow gauge, constructing to increase flow of water .............. 5042
Order of horticultural inspector, refusal or neglect to comply with .... 4766
Officers to prosecute for gambling, etc. ............................ 4851
Park private for fish or game, trespassing upon ..................... 4843
Penalty for judge divulging name of candidate for whom elector voted 4591
Penalty, when none, punishment is fixed ............................. 4682
Person or transportation company, etc., unloading sheep to be moved upon
    range, being first inspected .................................... 5067
Person found in house or place kept as a resort for smoking opium ... 4710
Permitting certain games to be conducted, where ..................... 4845

Poisoning animals ................................................... 5081
Postponing telegraphic messages ..................................... 5098
Private park for fish or game, trespassing upon ..................... 4843
Procuring warrant of arrest maliciously ............................. 4680
Provisions of sections 4828 and 4829, relating to fish and game, violation
    of .............................................................. 4831
Proclamation, persons shipping sheep into state after ............... 5065
Property listing for less than its cash value ....................... 4794

**64**

Prosecuting attorney, failure to perform duty.......................... 4851
  failing to prosecute assessor, when................................. 4795
  duty to prosecute assessor, when .................................. 4795
Proclamation of governor concerning diseased sheep, violation of penalty 5063
Putting dead animals in streets ....................................... 4730
Quietude of neighborhood, disturbing .................................. 4713
Racing on highways .................................................... 4757
Railroad engineers intoxicated......................................... 4754
Railroads, neglecting to ring bell, etc................................ 4753
  putting passenger cars in front of freight ......................... 4755
  employees violating duties ......................................... 4756
Remaining after being warned .......................................... 4774
Refusing to disperse on lawful command ................................ 4779
Refusing to comply with order of horticultural inspector .............. 4766
Rescuing prisoner from custody ........................................ 4619
Return of marriage, neglect to make return, penalty.................... 4722
Retaining possession and disposing of state arms ...................... 4805
Riot defined, etc................................................. 4769–4770
Riot, neglect of officers to disperse ................................. 4775
Rout defined, etc. .................................................... 4771
Search warrants maliciously procured.................................. 4680
Sections 628, 630 or 640 of Political Code, Notation of................ 4860
Seine or net, catching fish with ...................................... 4835
Selling spirituous liquor to minors.................................... 4716
  to Indians ......................................................... 4717
  adulterated candy.................................................. 4755
  coal, hay, etc., of short weight.................................... 5007
  fire arms, etc., to Indians......................................... 5764
  liquor to a minor................................................... 4716
  liquor at camp meetings ............................................ 4706
  opium for smoking .................................................. 4708
  tainted food ....................................................... 4748
Sending letter, threatening to expose ................................. 5105
Setting vessel adrift ................................................. 5085
Sheriff, receiving fine or forfeiture arising from a judgment, duty of.. 4788
Sheep, allowing to be loaded on ferry boat, etc., without production of
  certificate ........................................................ 5075
  shipping into state after proclamation of governor ................. 5265
  infected with scab for fifteen days without person in control reporting
    the fact to deputy sheep inspector ............................... 5072
  herder refusing to be sworn by deputy sheep inspector as to condition of
    sheep ............................................................ 5074
  diseased, driving into state, proclamation of governor, violation of,
    penalty........................................................... 5063
  crossing inspection lines, duty of inspector........................ 5068
Solemnizing marriage, making false return, penalty .................... 4631
Stray sheep getting into band, when duty of person in charge ........ 5077
Statement; corporation neglecting or refusing to file statement ....... 5025
Sunday, disturbing religious meetings on .............................. 4705
Surgery and medicine; practicing without a license .................... 4739
Taking or obstructing water in flume, etc............................. 5039
Taxes, refusing to give tax collector name of employee ................ 4792
  illegally delivering receipts for poll.............................. 4790
Tearing down, fences, etc. ............................................ 5087
  notices ............................................................ 5091
Telegraph messages, altering.......................................... 5102
Telegraph information, using.......................................... 5099
Telegraph message, postponing out of turn ............................ 5098
  clandestinely learning contents .................................... 5100
Telegraph message, forging............................................ 4941

Title, abstract of, engaging in making without filing bond ............ 5112
To make return of marriage, neglect, penalty......................... 4722
Trade marks, counterfeiting.......................................... 4950
    selling goods with counterfeit ..................................... 4950
    defacing on logs, etc............................................ 5002
Transportation company, etc., unloading sheep to be driven upon range,
    etc., without certificate of health from inspector ................... 5068
Unlawful assembly ................................................. 4772
Using information fraudulently obtained from telegraphic message..... 5099
Vagrancy ......................................................... 4852
Value cash; assessor listing property for less ........................
Violating provisions of Chapter CCXVI of the Penal Code, relating to
    vinegar ....................................................... 4744
Violation of provisions of Secs. 704 and 705 of Political Code relating to
    sheep ......................................................... 5068
Violating sections 4822–4823–4824, relating to game................... 4825
Violation, of provisions of Secs. 4828–4829, relating to game .......... 4831
    of section relating to fine and forfeitures ......................... 4788
    of Chap. XV, of the Political Code, relating to dental laws.......... 4741
    provisions of Secs. 638, 639 or 640 of Political Code ................ 4860
Water way; obstructing overflow gauge of.......................... 5041
Water, refusing willfully to deliver water, etc., from irrigation canal .. 5040
    diverting from ditch or channel ................................... 5043
Willfully neglecting or refusing to deliver water, etc., from irrigation canal 5040
Witness, neglecting to appear as a witness .......................... 4849
    before legislature............................................... 4610
    preventing attendance of........................................ 4654

Although a few new misdemeanor public offenses appear to have been created, a comparison of the 1887 list of misdemeanors with the 1901 list shows no change from the statutes of 1887. For instance, R.S. 1887 § 7133 in 1901 is codified as § 5032, and continues to criminalize obstructing a public road. Section 5033 of the 1901 Code continue 1887 R.S. § 5033, criminalizing the flooding of public highways, roads or streets. Injury to a public highway, however, under § 5028 of the 1901 Code, continues to be a felony or indictable misdemeanor as under 1877 R.S. § 5028. Racing on public highways, a misdemeanor under 1877 R.S. § 6928, continues to be a misdemeanor public offense under § 4757 of the 1901 Code, etc., *ad infinitum.* To which should be added at this highly appropriate time, and which might have gained honorable mention in connection with *Associated Taxpayers of Idaho, Inc. v. Cenarrusa,* 111 Idaho 502, 725 P.2d 526 (1986) (the lottery initiative issue wherein mention was made that betting on horses was skill, not chance). Section 4578 of the 1901 Code carried forward 1887 R.S. § 6366, making it a misdemeanor public offense to bet, or offer to bet or wager upon the success of failure of any particular candidate.

In 1913 the legislature appears to have for the first time addressed the presence of automobiles in Idaho. 1913 Idaho Sess. Laws, ch. 179, pp. 558–573. A state Highway Commission was created, licenses and registrations were required, and apropos our concern today a Purpose of the Act was "PRESCRIBING RULES AND REGULATIONS FOR OPERATION AND RUNNING MOTOR VEHICLES ON THE PUBLIC HIGHWAYS OF THE STATE."

**Sec. 26.** Every motor vehicle operated or driven upon the public highways of this State shall be provided with adequate brakes, in good working order and sufficient to control such vehicle at all times when the same is in use, and an adequate horn or other device for signaling sufficient under all conditions to give timely warning of the approach of the motor vehicle, and shall, during the period from one hour after sunset to one hour before sunrise, display at least two lighted lamps on the front, and one on

the rear of such vehicle, which shall also display a red light visible from the rear; the white light of such rear lamp shall shine upon and illuminate the number plate carried on the rear of such vehicle so that the said number will be clearly visible at a distance of one hundred feet. The light of the front lamps shall be visible at least two hundred feet in the direction in which the motor vehicle is proceeding. Every person operating or driving a motor vehicle on the public highways of this State shall also, when approaching a cross road outside of the limits of a city or incorporated village, or another intersecting highway or street or curve or corner in a highway or street, where the operator's view is obstructed, slow down the speed of the same, and shall sound his horn or other device for signaling in such a manner as to give notice and warning of his approach; *Provided,* That a motor cycle shall be considered to have complied with the provisions of this Section by carrying one front lamp visible for a distance of one hundred feet.

**Sec. 27.** Whenever a person operating a motor vehicle shall meet on the public highway any other person riding or driving a horse or horses, or other draft animals or any other vehicle, the person so operating such motor vehicle shall reasonably turn the same to the right so as to give half of the traveled road, if practical, and a fair and equal opportunity to pass, to the other, without interference; or, if they are traveling in the same direction, the person overtaking shall pass on the left side of the person so overtaken, and the person overtaken shall give the other a convenient opportunity to pass, if it can be done without endangering his own vehicle, person, horses, or other draft animals; *Provided,* That on canyon roads or other roads bordering on any precipice, stream or river, and upon dugways, such person operating such motor vehicle shall be required to take the side nearest to any such precipice, stream or river, and the other side of the dugway. Any person

operating any motor vehicle upon any public highway shall give warning, either by blowing a horn or ringing a bell, within fifty and not to exceed one hundred yards distant from any person riding or driving any horse or horses, or any vehicles drawn by horses or other draft animals, which the said motor vehicle may meet or overtake, and shall also give such warning upon approaching any sharp turn, curve, or dugway, or *other dangerous place upon such high-*way; and upon approaching such sharp turn, curve, dugway, or other dangerous place upon such highway, shall reduce the speed of such motor vehicle, and shall have the same under perfect control.

**Sec. 28.** Every person operating a motor vehicle on the public highways of this State shall drive the same in a careful and prudent manner and at a rate of speed so as not to endanger the property of another or the life or limb of any person; *Provided,* That a rate of speed in excess of thirty miles an hour for not less than one-fourth of a mile shall be presumptive evidence of driving at a rate of speed which is not careful or prudent.

**Sec. 29.** The local authorities of counties, cities and incorporated villages in this State shall have no power to pass, enforce or maintain any ordinance, rule or regulation requiring from any owner of a motor vehicle or any dealer or manufacturer to which this Act shall be applicable, any tax, any license or permit for the free use of the public highways or streets or alleys of such county, city or incorporated village, or prohibiting or excluding any such owner, manufacturer, or dealer from the free use of such highways, streets and alleys, or excluding or prohibiting any motor vehicle registered in compliance with this Act from the free use of such highways, streets and alleys. *Provided,* That the powers given by general statutes to local authorities in cities and villages to enact general ordinances applicable equally and generally to all vehicles and uses of streets to bring about the orderly passage of vehicles

upon certain streets in such cities and villages where the traffic is heavy and continuous, and the powers given to cities and villages to regulate vehicles offered to the public for hire, or processions, assemblages or parades in the streets or public places, shall remain in full force and effect, and all ordinances, rules and regulations which may have been or which may be enacted in pursuance of such powers shall remain in full force and effect; nor shall this Act be construed so as to prevent cities and incorporated villages of this State from enacting and enforcing general ordinances prescribing additional rules and regulations as to the speed or manner of driving or operating motor vehicles on any of the streets of such cities or villages, and prescribing other and additional rules and regulations pertaining to signals to be given by drivers or operators of motor vehicles, the carrying of lights on such motor vehicles, the turning of motor vehicles in streets, and rules and regulations of motor vehicles in passing other vehicles and pedestrians.

**Sec. 30.** No person shall operate or run any motor vehicle upon any of the public highways of this State while such person is under the influence of intoxicating liquor.

**Sec. 31.** Any person violating any of the provisions of this Act shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by imprisonment in a county jail not exceeding six months, or by a fine not exceeding Three Hundred ($300.00) Dollars, or by both such fine and imprisonment.

Even as late as 1908 when the Idaho Revised Codes were enacted and published, the 1887 R.S., §§ 7480–7495, were carried forward without change in section number or content. *See* 1908 Revised Codes, Title 3, ch. 1, pp. 704–707. En route procedure was changed so that criminal prosecutions could also be commenced by complaint and information, rather than indictments, and a preliminary hearing became a requirement in the usual case on a felony charge.

Section 6309 of the 1908 R.C. continued to identify a crime as public offense, just as had R.S. 1887 § 6309: "A crime or public offense is an act committed or omitted in violation of a law...." Section 6310 of both acts remained the same: "Crimes are divided into: 1. Felonies, and 2. Misdemeanors."

Enough documentation should have been produced at this point to illustrate that in a period extending almost a century, Idaho, both as a territory and then as a state, both in legislation and in the Constitution itself, has recognized that punishable public offenses are and have been misdemeanors and felonies, and that as to misdemeanors a defendant is entitled to a jury trial unless he waives that constitutional guarantee. Those who would say otherwise are guilty of supposition and wishful thinking.

In the year 1982 the people of Idaho ratified a number of constitutional amendments proposed by the legislature. The instant legislation now under challenge should have been presented to the people at that time as a proposed constitutional amendment. There are many believers in the constitutional protections that might not have voted for such an amendment. A fair and square presentation was to have been preferred.

But, I surmise that there were indeed many legislators who would not have voted for the proposition, and I do not doubt that there were a good many of those legislators who voted for the Traffic Infractions Act without knowing that it was not legislation drafted by the legislature, or at its instance. Which is not to say that legislative leadership was not well aware of the source of the 1982 Traffic Infractions Act.

### APPENDIX A

June 12, 1981

Memorandum to: TRAFFIC INFRACTIONS ACT COMMITTEE

Re: MINUTES OF FIRST MEETING OF TRAFFIC INFRACTIONS ACT COMMITTEE, JUNE 11, 1981

The first meeting of the committee was called to order on Thursday, June 11, at

9:00 o'clock a.m. Present were: The Honorable John Maynard, Carl F. Bianchi, The Honorable Phillip M. Becker, The Honorable Warren Gilmore, The Honorable A. Marvin Cherin, The Honorable William W. Black, The Honorable Richard Schmidt, Glen Walker, R. Keith Roark, Michael B. Kennedy, Jim Johnston, John Church, Mary Kautz, Frances Philpot, and Jay Bates, Legal Counsel of Department of Law Enforcement (representing Kelly Pearce, Director), with Sgt. Doug Kramer, Idaho State Police, and Lon Davis (present as liaison to Supreme Court Criminal Rules Committee).

Carl Bianchi reviewed the charge to the committee: the Chief Justice has asked the committee to develop amendments to present to the legislature to allow successful implementation of the Idaho Traffic Infractions Act.

Glen Walker explained that the genesis of the original Act, HB 343, was the overwhelming burden of jury trials in Kootenai and other counties, causing a potential breakdown in the system. Keith Roark said that the prosecutors thought that traffic control is more properly addressed in a civil forum rather than a criminal procedure, and that the prosecutors had attempted to develop in HB 343 a procedure that was a combination of a small claims hearing and a criminal procedure, with the goal to take non-serious offenses out of the criminal forum. Both prosecutors said that they were delighted with the formation of the committee and the opportunity to polish the Act with all views represented.

Judge Maynard said that the courts had been requesting a change in traffic court procedures for some time, and commended the prosecutors for coming forward with a bill which is acceptable in concept.

The committee discussed in great detail the philosophy behind a traffic control/safety program, the problems of enforcement of traffic laws and court procedures, and whether the courts should be involved in enforcement where defendants fail to appear. There was some discussion as to whether the court should pick up a driver's license when a citation is issued, although there were counter-arguments holding that this would increase traffic court appearances, contradicting the more streamlined mail-in procedures which have been adopted with great success during the last year. There was some feeling that the whole system of traffic law enforcement needs to be reviewed, particularly in light of the cancellation of driver rehabilitation programs. Also, it was thought that the committee could profit from the experience of other states in traffic law enforcement.

Carl Bianchi said that many of the present problems are caused because we are trying to deal with a motor vehicle safety program through the court criminal process, and that there is a need to change our philosophy of the purpose of traffic courts. Just as the courts established the small claims departments to provide a quick and easy dispute resolution mechanism for minor monetary disputes, we should seek to establish a similar procedure for enforcing the state's system of traffic control and safety.

*There was a committee consensus that the present system, utilizing the full panoply of the court criminal process, is not working satisfactorily, and that the committee should recommend amendments to the Traffic Infractions Act which will result in the most expeditious system to process traffic control measures in a non-criminal environment.*

Keith Roark noted that the Traffic Infractions Act contains a potential constitutional problem because while an infraction itself is not a criminal offense, a series of offenses could result in a criminal offense, and if constitutional safeguards are not maintained in the processing of infractions, a later criminal prosecution could be tainted. Therefore, we have to accept the possibility of part of the Act or the entire Act being overturned on constitutional grounds and later having to seek a constitutional amendment, and the legislature should be advised of this possibility in any final report of the committee.

Judge Schmidt agreed to report to the committee at the next meeting on the system utilized in California to enforce appearances by defendants, and Judge Gilmore agreed to review recent literature and describe traffic enforcement systems used by other states. Pending these reports, the committee tentatively agreed to include a new provision in the Traffic Infractions Act providing that a failure to appear in court in answer to a citation for an infraction would be grounds for suspension of a driver's license, and to clean up the notice provisions of the statute to allow proof of mailing to serve as notice.

The following amendments to the Act tentatively were approved by the committee for review at the August 14 meeting.

*Pages 1–8, Sections Moving DWI, Reckless, and Title 10 (Accident) Sections From Title 49 to Title 18*

Jay Bates reported that the Department of Law Enforcement saw no problem in moving portions of Title 49 which would still be treated as misdemeanors to Title 18, and did not feel that this would cause any statutory reference problems for the department. It was ultimately decided that the final draft amendments proposed by the committee would shift all traffic misdemeanors to Title 18, so that all remaining violations in Title 49 would be infractions. Keith Roark and Glen Walker volunteered to review and rewrite the Title 18 sections of the Bill to provide for the following:

1.  Adding any other traffic misdemeanors to the Title 18 sections.
2.  Wherever the bill now uses "motorized vessel," this will be changed to "motorized boat, vessel, or watercraft."
3.  Review all changes from the original Title 49 provisions to determine whether terms such as "operate" need to be revised.
4.  Clear up problem on page 3, lines 33–40, where lumping boating act violations into general DWI section has resulted in suspension of *driver's license* for watercraft violation. (Also

applies to reckless driving sections and accident sections.)

It was also decided to add violations of Idaho Code § 49–337, regarding driving while license suspended or revoked, to Title 18, as well as Idaho Code § 49–233, driving without insurance.

The committee decided to remove the minimum sentence on reckless driving, page 4, lines 4–6.

The committee noted that Idaho Code § 49–1532 and Idaho Code § 49–337 were overlapping and confusing to officers and courts, and recommended that these two sections be consolidated (still to be included in Title 18).

The law enforcement committee representatives agreed to review Title 49 and make recommendations to the prosecutors prior to the next meeting for any other Title 49 violations which they feel should be misdemeanors and included in Title 18, rather than becoming infractions and staying in Title 49.

The Department of Law Enforcement will recommend whether Chapter 9 of Title 49, concerning weight, speed, and tire regulations should be moved to Title 18 and remain misdemeanor violations. (This would require an amendment on page 8, line 6 to the existing section 5 of the bill, as well as a shifting of the section.)

*Section 49–3401*

Change definition of infraction to include "civil in nature" and definition of penalty to refer to "judgment entered."

*Section 49–3402*

Add provision stating that Uniform Citation will be used for infractions.

Review lines 46–48 to determine whether defendant should sign citation, after committee decides method of enforcement on failures to appear (some committee members felt it was silly to make it a misdemeanor to not sign a citation for an infraction, and that this provision is just a hassle for law enforcement officers).

### Section 49–3403

Change ten day requirement to mailing or paying prior to appearance date.

### Section 49–3404

Eliminate reference to imposition of greater penalty if defendant seeks trial; set a standard, uniform fine, regardless of whether defendant pleads guilty or appears to contest citation. (Under inherent powers, and without magic words for mandatory minimum sentence, judge may still suspend penalty, but committee decided not to deal with this issue in Act.)

Retain "Beyond a Reasonable Doubt" standard of proof.

### Section 49–3405

Committee decided to pass this provision dealing with failure to comply with penalty until the next meeting when Judge Schmidt and Judge Gilmore could report on other state methods of dealing with problem.

Also, Mike Kennedy agreed to recommend drafting changes to this provision to satisfy Attorney General concerns with constitutionality relating to Art. 2, § 15, Idaho Constitution.

### Section 49–3406, Amount of Penalties

The committee approved an amendment to eliminate a statutory penalty amount in favor of the provision stating that "the judgment entered for the commission of an infraction shall be the amount set for that infraction in the payment schedule to be adopted by Supreme Court order and published annually by the Administrative Director of the Courts" [last few words added by Carl and not yet reviewed by committee].

It was understood that the Supreme Court bond schedule (which later would become the payment schedule) would be reviewed to try to streamline the bond schedule to provide a uniform bond for almost all moving and non-moving offenses. The law enforcement officer representatives agreed to recommend those violations now on the bond schedule which should have a greater fine than the uniform fine. [This could result in either shifting the violation to Title 18 and retaining it as a misdemeanor, or keeping it as a violation but setting a higher payment amount.] The committee felt that any exceptions should be kept to an absolute minimum.

### New Provision

Add new provision to Act specifically stating that all proceedings regarding infractions will be on the record.

### Section 49–3407, Appeals Procedures

Eliminate reference to not staying action by the department on appeal.

Revise reference to rules, pending report by Lon Davis as to which rules should be used on appeal, and what potential rule changes need to be made by Supreme Court.

### Section 49–3408, Infraction Citation Forms

Repeal in entirety; use Idaho Uniform Citation for infractions; revise citation form to include instructions for mailing payment.

### Section 49–3409

Repeal in entirety.

### Sections 49–3410 and 3411

No change. Section 49–3411 solves problem of conflicting local ordinances.

### Section 49–3412

Change jurisdiction to $2,000, line 35, page 10.

### Section 18–109

No change.

### Section 49–602

Eliminate reference to unlawful nature of offense.

### Section 49–739

No change.

### Section 49–801

No change, except make sure that all remaining sections of Act changing misdemeanor references to infractions use same phraseology, preferably "shall be subject to," instead of "guilty."

*Section 49–837A, 49–848, 49–909, 49–2614, 49–3227, & 49–320*

Repeal in entirety all * but § 49–3227, in favor of one new section saying that all Title 49 violations will be infractions. Retain needed portions of § 49–3227, with same amendments regarding language relating to "guilty."

*Section 49–328*

Repeal in entirety.

*Section 49–330*

Page 16, line 45, change statutory reference to § 18–6902.

Page 17, lines 13, 16, and 44 change proof to "the commission of." Line 21, eliminate "and infractions." Lines 46–47, change statutory references to Title 18 sections.

*Section 49–335, Unlawful Use of License*

Shift this entire section to Title 18, without change.

*Section 49–342*

Repeal in favor of one new section making all Title 49 violations infractions

*New Section*

Add new section to Traffic Infractions Act creating one catch-all penalty provision for all Title 49 violations, making them infractions.

*Additional Changes*

It was noted that if the committee amendments include a reference to the Supreme Court Bond Schedule, rather than a uniform statutory fine, no changes in dollar amounts will be necessary; however, any statutory reference must be amended to include a special provision for speeding in a previously posted area as having a maximum $16.50 fine (effective July 1, 1981).

The committee concluded its review of the Act by discussing problems created by not having a prosecutor appear in a pro se traffic trial. There was general agreement that law enforcement officers should not be allowed to undertake an adversary role in such proceedings, and that it may be the unauthorized practice of law to allow a law

* This decision subject to reconsideration at next

enforcement officer to make an opening statement or cross-examine witnesses in such proceedings. Carl Bianchi indicated that some directive might be forthcoming from his office on this point in the near future.

Meeting adjourned at 4:00 o'clock p.m.

Respectfully submitted,

_____

Carl F. Bianchi
Committee Reporter

dm

## APPENDIX B

## MINUTES OF TRAFFIC INFRACTIONS ACT COMMITTEE MEETING

August 14, 1981

Elkhorn at Sun Valley

The meeting was called to order at 9:00 o'clock a.m., committee members present were: The Hon. John Maynard; Carl F. Bianchi; The Hon. Phillip M. Becker; The Hon. Warren H. Gilmore; The Hon. A. Marvin Cherin; The Hon. William Black; The Hon. Richard Schmidt; Jim Johnston; Mary Kautz; Peter Erbland, representing Glen Walker; Howard Hill, Director of Motor Vehicle Division, representing Kelly Pearce; Lon Davis. Also present were Art Smith, City Attorney, Idaho Falls, representing Association of Idaho Cities; Sgt. Doug Kramer, Idaho State Police; Jay Bates, Legal Counsel Department of Law Enforcement.

Lon Davis and Judge Gilmore reported on how other states have decriminalized traffic offenses. Some states have made traffic offenses a civil matter and set up administrative agencies to handle them; others have created a petty misdemeanor category and applied criminal law procedures.

Judge Schmidt analyzed the California decriminalization statute: this is an experimental program begun in 1979, which will expire in five years without further legislative action. It is now operating in three

meeting after review of draft amendments.

pilot counties. California has created three types of offenses: felonies, misdemeanors, and infractions. Infractions are not subject to imprisonment and there is no right to trial by jury or appointment of counsel at public expense for indigents. The federal courts have found that where a jail term of less than six months or fine of less than $500 is involved, it is a petty offense and no jury trial is needed. Judge Schmidt concludes that removing the right to a jury trial for minor traffic offenses will not violate the Idaho Constitution.

Carl Bianchi reviewed the American Bar Association Standards for Traffic Court Justice: The ABA recommends that traffic cases should be decided within a unified court system in the judicial branch of government, that there should be record proceedings, and that motorists should be allowed to pay fines by mail.

Sgt. Douglas Kramer recommended which violations in chapters 5–8 of Title 49 should remain misdemeanors:

49–592(a) Defacing vehicle numbers

49–603 Obedience to traffic direction

49–616 Interference with traffic control devices

49–631 & 49–632 Combine into one statute (using freeway turn acrosses and restricted access)

49–676 Overtaking and passing school bus (should be re-drafted and clarified

49–687 Drag racing

49–732 Pedestrians under influence of alcohol and drugs (to keep power of arrest)

49–843 Vehicle transporting explosives to 4,000 lbs. over

The committee agreed that these violations would remain misdemeanors. After some discussion it was decided to keep Chapter 9, dealing with weight violations, as misdemeanor violations rather than infractions. Department of Law Enforcement representatives agreed to prepare a revision of § 49–676, to ease prosecution.

Carl Bianchi reported on administrative judge reactions to the original committee approach, and then reviwed the July 7 draft which was recommended by the committee.

Jay Bates recommended and the committee approved keeping Idaho Code § 49–827(c) dealing with improper use of flashing lights as a misdemeanor rather than an infraction. The committee decided that while there were numerous areas in Title 49 which could profit from clarification, that the committee should confine itself to recommendations concerning decriminalization of minor traffic offenses.

The committee considered the policy issue of whether there should be higher fine amounts for certain infractions and whether court appearances should be required for particular infractions: the committee agreed that there would be one uniform fine for moving traffic infractions and one uniform fine for non-moving traffic infractions, and also determined that court appearances should not be required for any infractions, although a defendant could choose to appear before a judge. All violations which are classified as infractions will be eligible for mailing in the fine. This will include excessive speed violations, and law enforcement officers will be instructed to consider citing such violations as reckless driving rather than speeding. The only exception to the uniform fine will be the statutory offense of exceeding a previously posted limit, where the legislature has set the maximum fine of $5.00.

The committee consensus was to scrap the approach of establishing infractions as being civil in nature and instead proceed to establish three classes of offenses in Idaho: felonies; misdemeanors; and infractions. After discussing the advisability of requiring the defendant to sign a copy of the citation, the committee determined that proof of receipt of the citation outweighed other disadvantages and decided to keep that requirement. It will not, however, be a misdemeanor to refuse to sign the citation; rather the officer will take the defendant into custody and require a posting of bond, as is now the case.

The committee agreed that a police officer should still have the discretion to arrest

a driver who has committed an infraction and require posting of bond. The Supreme Court fine schedule will include a reference to setting bond amounts in the same amount as that listed for the fine for the infraction.

After considerable discussion about how to handle defendants who fail to appear in answer to an infraction citation, the committee agreed that a failure to appear will remain a misdemeanor.

The committee agreed that general criminal procedures should be used in processing infraction citations, and that criminal terminology should be used.

The issue of whether a judge should have discretion to suspend or reduce the amount of a fine listed in the Supreme Court fine schedule for infractions occasioned lengthy debate. Some committee members felt that allowing a judge to reduce the amount of the fine would increase the number of appearances in court. Jim Johnston suggested that this discretion has caused judge shopping in the past. Lon Davis and Judge Becker felt that judicial discretion is needed—that persons have their only experience before a judge and should see discretion exercised. Judge Maynard and Sgt. Kramer felt it was unfair to defendants to have different fines and Judge Schmidt pointed out the difficulty of explaining to citizens why one defendant is fined more than another for the same offense. Peter Erbland suggested that courts may need to provide an emotional release for defendants and that this might not be present if discretion were removed. Three main views were expressed:

1. That judges should have no discretion and should have to impose the set fine listed for infraction if the driver was found to have committed the infraction.

2. That a judge should have complete discretion to suspend or reduce the fine.

3. That a judge should have discretion, but only if written findings are made as to why that discretion was exercised.

When a vote was taken no more than four persons were certain which approach they supported and no committee consensus was reached.

The committee voted overwhelmingly to adopt the Lon Davis draft approach of establishing a separate category for infractions and retaining the general criminal case process. It was agreed to attempt to prepare an amending bill to the original House Bill 343 if possible, but that if this proves unworkable, the committee recommends repealing the original Traffic Infractions Act and proceeding with the Lon Davis draft approach.

The committee agreed almost unanimously that a January 1, 1983 effective date should be recommended for the committee bill, to allow time for law enforcement agencies to reprint citation forms through competitive bidding and to allow training of court and law enforcement personnel. It was suggested that the courts and law enforcement should hold joint training programs in the fall of 1982 to explain the new law.

The committee agreed to hold another meeting if necessary and Carl Bianchi will contact committee members after the next draft is prepared. Art Smith was invited to become a member of the committee, or at least to continue his participation as an observer on behalf of the Association of Idaho Cities.

The committee approved the outline of the report of committee/cover letter which would be signed by Judge Maynard on behalf of the committee and sent to the Chief Justice and the Chairman of the House and Senate Judiciary Committees. The committee unanimously agreed that in any case the legislature should be advised that the present Traffic Infractions Act cannot be allowed to go into effect on July 1, 1982 without serious consequences to the state. Also, it was agreed that a new infraction citation form needs to be prepared and circulated for comment as soon as possible. The major changes necessary will be on the defendant copy.

Carl Bianchi reported on steps taken to adopt standards for procedures in pro se traffic court trials. No action was taken on an Association of Idaho Counties Resolution concerning jury trials, although concern was expressed over jury trial cost. The meeting adjourned at 3:00 o'clock p.m.

/s/ Carl F. Bianchi
Carl F. Bianchi

## APPENDIX C

March 8, 1982

The Honorable Tom Stivers

House of Representatives

State of Idaho

Statehouse Mail

THIS IS NOT AN OFFICIAL OPINION OF THE ATTORNEY GENERAL AND IS SUBMITTED SOLELY FOR YOUR LEGAL GUIDANCE.

Dear Representative Stivers:

You have asked whether rights conferred by either the U.S. Constitution or Constitution of Idaho are violated by the elimination in certain circumstances of the right to a jury trial as proposed by HB 541.

Under the U.S. Constitution the question can surely and easily be disposed of in the negative. A statute which provides for the mere possible imposition of a $100.00 fine is a petty offense and a trial by jury is not constitutionally required. See *Duncan v. Louisiana*, 391 U.S. 145 (1968) and *Cheff v. Schnackenberg*, 384 U.S. 373 (1966). Indeed misdemeanors, as punishable by § 18–113, *Idaho Code*, ($300 and/or six months) do not require a jury to meet the requirements of the U.S. Constitution. See *Schnackenberg, supra.*

However, the issue of whether an infraction as defined by the Act requires a jury under the Idaho Constitution is less clear. The proposed Traffic Infractions Act, H.B. 541, creates what is said to be a new category of offense which is denominated an "infraction". To distinguish it from crimes, an "infraction" is punishable by a fine not to exceed $100. There is no possibility of incarceration for violations, nor may one be arrested for such violations. Under this bill there is no right to a jury trial for charged "infractions." Such an infraction would be punishable only by a fine not to exceed $100.

Art. I, § 7 of the Idaho Constitution provides:

§ 7. Right to trial by jury.—The right of trial by jury shall remain inviolate; but in civil actions, three-fourths of the jury may render a verdict, and the legislature may provide that in all cases of misdemeanors five-sixths of the jury may render a verdict. A trial by jury may be waived in all criminal cases not amounting to felony, by the consent of both parties, expressed in open court, and in civil actions by the consent of the parties, signified in such manner as may be prescribed by law. In civil actions the jury may consist of twelve or of any number less than twelve upon which the parties may agree in open court. Provided, that in cases of misdemeanor and in civil actions within the jurisdiction of any court inferior to the district court, whether such case or action be tried in such inferior court or in district court, the jury shall consist of not more than six.

By the terms of this provision, a jury may not be waived in felony cases and may be dispensed with in misdemeanor cases only with the consent of the accused or by some act of waiver attributable to the accused. The Idaho Supreme Court has interpreted the Constitution in such fashion for a lengthy period of time. See, e.g., *State v. Scheminisky*, 31 Idaho 504, 174 P. 611 (1918).

The meaning of the term "right to trial by jury" has generally been drawn from the meaning ascribed to the term at the time the Constitution was adopted. Accordingly, it has been held that the right to jury trial does not apply to actions unknown to the common law, *Brady v. Place*, 41 Idaho 747, 242 P. 314, 243 P. 654 (1925), and that it does not apply to special pro-

ceedings created by statute and not in the nature of common law actions. See *Comish v. Smith*, 97 Idaho 89, 540 P.2d 274 (1975) and *Blue Note, Inc. v. Hopper*, 85 Idaho 152, 377 P.2d 373 (1962).

It has been argued that a traffic "infraction" is neither a felony nor a misdemeanor and is therefore a new class of offense not known to the common law. In the case of *People v. Oppenehimer*, Super., 116 Cal. Rptr. 795 (1974), an intermediate appeals court in California upheld a traffic infractions act (in the face of a similar constitutional provision), on the theory that certain petty offenses did not require jury trials when the state constitution was adopted, and thus were beyond the scope of the constitutional provision. The California court believed that minor traffic offenses not involving intentionally culpable conduct were petty offenses and did not require jury trial.

The *Oppenheimer* case, which is persuasive only and not controlling in Idaho, furnishes no specific test for defining a "petty" offense. The court stated that the offense was not one to which "social or moral opprobrium" attached and was not an offense requiring proof of a culpable state of mind. For U.S. constitutional purposes "petty offense" would probably be held to mean an offense subject to six months or less incarceration and/or a fine of $500.00 or less. See *Duncan v. Schnakenberg, supra.*

There is some doubt whether the California approach to defining offenses would be accepted in Idaho courts. In *State v. Miles*, 43 Idaho 46, 49, 248 P. 442 (1926), the Supreme Court held that:

> The rule is well established that the guarantee of right of trial by jury serves that right as it existed under the common law *and territorial statutes in force at the date of the adoption of our constitution.* (emphasis added).

Thus, a "crime" which was defined as a misdemeanor by territorial statutes was recognized as one to which the right of jury trial attached.

When faced with the question of whether contempts could be tried and punished without a jury, however, the Idaho Supreme Court ruled that contempts are "not criminal actions," *McDougall v. Sheridan*, 23 Idaho 190 (1913), even though called misdemeanor by statute and punished as misdemeanors; and that art. I, § 7 did not apply. *Dutton v. Dist. Ct.*, 95 Idaho 720, 518 P.2d 1182 (1974). Despite the constitutional and statutory language, the Court held that contempts which were punishable without a jury trial prior to the adoption of the constitutional and territorial statutes were still so punishable.

The present definition of misdemeanor offenses was in effect at the time the Idaho Constitution was adopted.

> 18–111. *Felony and misdemeanor defined.* A felony is a crime which is punishable by death or by imprisonment in the state prison. *Every other crime is a misdemeanor....* [emphasis added]. Same as R.S. 6311, 1887.

Under this definition infractions and contempts both are crimes. Accordingly, the Idaho Constitutional requirement of a jury trial may or may not apply to "infractions." The debate becomes whether, because of their nature, "infractions" would be deemed "crimes" for right to jury purposes. If an infraction is a "crime," whether it is called an "infraction" or anything else, the jury trial requirement of the Constitution is probably applicable.

A factor mitigating against the "California" approach, is that Idaho's territorial laws defined crimes and offenses as follows:

> A crime of *public offense* is an act committed or omitted in violation of a law forbidding or commanding it, and to which is annexed, upon conviction, any of the following punishments:
> 1. Death;
> 2. Imprisonment;
> 3. *Fine;*
> 4. Removal from office; or,
> 5. Disqualification to hold [office] ...
> R.S. 6309, 1887. [emphasis added]

Of course, conviction of a crime may have consequences ranging from grave to minor,

but the distinction between serious and minor misdemeanors does not appear in the state Constitution for purposes of determining the existence of a right to trial by jury. All penal provisions not amounting to felonies were considered misdemeanor offenses when the Constitution was adopted.

There can be no question that the Traffic Infractions Act is akin to a penal statute. The Act is enforced by police officers who issue summonses and complaints. The citation must contain a certification by the officer that he has reasonable ground to believe that the defendant committed what is referred to as an "offense" in violation of the law. I.C. § 19-3901. Failure to appear can result in the issuance of a warrant for the violator's arrest. I.C. § 19-3901. A fine of up to $100 is possible. I.C. § 19-1902.

However, one apparently may not be arrested for an infraction, as proposed,[1] nor may one be incarcerated upon adjudication. In this regard an infraction deviates sharply from all crimes known at the time the Constitution was adopted. For instance, for failure to sign a citation one arguably could not be jailed as is now the case. Perhaps the statute should specifically address this question.

There is no clear indication which way the Court might ultimately rule. While the territorial statutes defining crimes and art. I, § 7, Idaho Constitution, may be applied, the Court might also rely on the *Oppenheimer* precedent following the logic of that Court and of the U.S. Supreme Court when it noted in *Duncan:*

> ... [T]he possible consequences to defendants from convictions for petty offenses have been thought insufficient to outweigh the benefits to efficient law enforcement and simplified judicial administration resulting from the availability of speedy and inexpensive nonjury adjudications ...

There are two alternative actions which could be taken by the legislature to facilitate the implementation of the infraction act. The first would be to amend the licensing provisions of title 49, *Idaho Code,* to provide for a waiver of whatever right to a jury trial for traffic infractions might be claimed to exist by an "implied consent" notion as is now used for alcohol testing. It is unclear what effect, if any, this might have, but it could give a reviewing court an additional factor to rely upon in not applying article I, § 7 to infractions. The second would be to propose an amendment to § 7 of article I expressly declaring infractions to be a third category of crime and constitutionally eliminating the right to a jury trial for such infractions.

In summary, it is unclear how this bill would be reconciled with article I, § 7, of the Idaho Constitution. Only the Idaho Supreme Court can make that determination with certainty. If you have further questions on this or any other matter, please contact this office.

Very truly yours,
/s/ DAVID H. LEROY
Attorney General

DHL/bc

---

**1.** The Idaho Criminal Rules Cases voted February 12, 1982, to provide no rule for arrest upon failure to sign the citation on an infraction, since arrest was inconsistent with the non-incarceration nature of an infraction.